UNITED STATES of America, Appellee,

v.

Robert CHESTMAN, Defendant–Appellant.

No. 309, Docket 89–1276.

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1990.

Decided Oct. 7, 1991.

---

Elkan Abramowitz, New York City (Alan J. Brudner, Barbara L. Hartung, Alan P. Williamson, Morvillo, Abramowitz & Grand, New York City, of counsel), for appellant.

David E. Brodsky, Asst. U.S. Atty., S.D.N.Y. (Roger S. Hayes, Acting U.S. Atty. for S.D.N.Y., Gerard E. Lynch, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Paul Gonson, Sol., S.E.C., Washington, D.C. (James R. Doty, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Richard A. Kirby, Sr. Litigation Counsel, Brian Bellardo, Sr. Sp. Counsel, Randall W. Quinn, Rada L. Potts, S.E.C., Washington, D.C., of counsel), for amicus curiae S.E.C.

Before OAKES, Chief Judge, FEINBERG,* MESKILL, NEWMAN, KEARSE, CARDAMONE, WINTER, PRATT, MINER, ALTIMARI, MAHONEY and McLAUGHLIN, Circuit Judges.

---

**ON REHEARING IN BANC**

MESKILL, Circuit Judge, joined by CARDAMONE, PRATT, MINER and ALTIMARI, Circuit Judges:

In this rehearing *in banc*, we consider for the first time the validity of Rule 14e–3(a), 17 C.F.R. § 240.14e–3(a), which was promulgated by the Securities and Exchange Commission (SEC) under section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e); we then reexamine two familiar landmarks of the securities fraud landscape, section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b), and the mail fraud statute, 18 U.S.C. § 1341. The issues spring from the alleged insider trading of defendant Robert Chestman. A jury found Chestman guilty of thirty-one counts of insider trading and perjury: (1) ten counts of fraudulent trading in connection with a tender offer in violation of section 14(e), 18 U.S.C. § 2, and Rule 14e–3(a),[1] (2) ten counts of securities fraud in violation of section 10(b), 18 U.S.C. § 2, and 17 C.F.R. § 240.10b–5 (1988) (Rule 10b–5), (3) ten counts of mail fraud in violation of the mail fraud statute and 18 U.S.C. § 2, and (4) one count of perjury in violation of 18 U.S.C. § 1621. A panel of this Court reversed Chestman's convictions in their entirety. 903 F.2d 75 (2d Cir.1990).

On *in banc* reconsideration, we conclude that the Rule 14e–3(a) convictions should be affirmed and that the Rule 10b–5 and mail fraud convictions should be reversed. We vacate the panel's decision on all three issues. We did not rehear the appeal from the perjury conviction and, as a result, the panel's reversal of that conviction stands.

---

\* Judge Feinberg participated in the decision to rehear the appeal *in banc* and heard oral argument. He subsequently retired from regular active service, however, and thus did not vote in the *in banc* decision. *See* 28 U.S.C. § 46(c); *United States v. American–Foreign S.S. Corp.*, 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960).

1. The indictment and judgment of conviction charge Chestman with violating Rule 14e–3(a) as well as Rule 14e–3(d). The record provides no other indications, however, that Rule 14e–3(d) was involved in this case. In fact, in the government's Memorandum of Law in Opposition to Defendant's Pretrial Motions, the government states:

> The rule [Rule 14e–3] also contains limited exceptions pertaining to multi-service financial institutions and brokerage transactions and establishes an "anti-tipping" rule with respect to material, nonpublic information concerning a tender offer. Rule 14e–3(b), (c), and (d). These provisions are not at issue here. The indictment invokes only subsection (a) of Rule 14e–3.

Thus, like the district court, 704 F.Supp. 451, 456 n. 4 (S.D.N.Y.1989), and the panel, 903 F.2d 75, 85 (2d Cir.1990), we assume that Chestman was convicted only under subsection (a) of Rule 14e–3.

## BACKGROUND

Robert Chestman is a stockbroker. Keith Loeb first sought Chestman's services in 1982, when Loeb decided to consolidate his and his wife's holdings in Waldbaum, Inc. (Waldbaum), a publicly traded company that owned a large supermarket chain. During their initial meeting, Loeb told Chestman that his wife was a granddaughter of Julia Waldbaum, a member of the board of directors of Waldbaum and the wife of its founder. Julia Waldbaum also was the mother of Ira Waldbaum, the president and controlling shareholder of Waldbaum. From 1982 to 1986, Chestman executed several transactions involving Waldbaum restricted and common stock for Keith Loeb. To facilitate some of these trades, Loeb sent Chestman a copy of his wife's birth certificate, which indicated that his wife's mother was Shirley Waldbaum Witkin.

On November 21, 1986, Ira Waldbaum agreed to sell Waldbaum to the Great Atlantic and Pacific Tea Company (A & P). The resulting stock purchase agreement required Ira to tender a controlling block of Waldbaum shares to A & P at a price of $50 per share. Ira told three of his children, all employees of Waldbaum, about the pending sale two days later, admonishing them to keep the news quiet until a public announcement. He also told his sister, Shirley Witkin, and nephew, Robert Karin, about the sale, and offered to tender their shares along with his controlling block of shares to enable them to avoid the administrative difficulty of tendering after the public announcement. He cautioned them "that [the sale was] not to be discussed," that it was to remain confidential.

In spite of Ira's counsel, Shirley told her daughter, Susan Loeb, on November 24 that Ira was selling the company. Shirley warned Susan not to tell anyone except her husband, Keith Loeb, because disclosure could ruin the sale. The next day, Susan told her husband about the pending tender offer and cautioned him not to tell anyone because "it could possibly ruin the sale."

The following day, November 26, Keith Loeb telephoned Robert Chestman at 8:59 a.m. Unable to reach Chestman, Loeb left a message asking Chestman to call him "ASAP." According to Loeb, he later spoke with Chestman between 9:00 a.m. and 10:30 a.m. that morning and told Chestman that he had "some definite, some accurate information" that Waldbaum was about to be sold at a "substantially higher" price than its market value. Loeb asked Chestman several times what he thought Loeb should do. Chestman responded that he could not advise Loeb what to do "in a situation like this" and that Loeb would have to make up his own mind.

That morning Chestman executed several purchases of Waldbaum stock. At 9:49 a.m., he bought 3,000 shares for his own account at $24.65 per share. Between 11:31 a.m. and 12:35 p.m., he purchased an additional 8,000 shares for his clients' discretionary accounts at prices ranging from $25.75 to $26.00 per share. One of the discretionary accounts was the Loeb account, for which Chestman bought 1,000 shares.

Before the market closed at 4:00 p.m., Loeb claims that he telephoned Chestman a second time. During their conversation Loeb again pressed Chestman for advice. Chestman repeated that he could not advise Loeb "in a situation like this," but then said that, based on his research, Waldbaum was a "buy." Loeb subsequently ordered 1,000 shares of Waldbaum stock.

Chestman presented a different version of the day's events. Before the SEC and at trial, he claimed that he had purchased Waldbaum stock based on his own research. He stated that his purchases were consistent with previous purchases of Waldbaum stock and other retail food stocks and were supported by reports in trade publications as well as the unusually high trading volume of the stock on November 25. He denied having spoken to Loeb about Waldbaum stock on the day of the trades.

At the close of trading on November 26, the tender offer was publicly announced. Waldbaum stock rose to $49 per share the next business day. In December 1986 Loeb learned that the National Association

of Securities Dealers had started an investigation concerning transactions in Waldbaum stock. Loeb contacted Chestman who, according to Loeb, "reassured" him that Chestman had bought the stock for Loeb's account based on his research. Loeb called Chestman again in April 1987 after learning of an SEC investigation into the trading of Waldbaum stock. Chestman again stated that he bought the stock based on research. Similar conversations ensued. After one of these conversations, Chestman asked Loeb what his "position" was, Loeb replied, "I guess it's the same thing." Loeb subsequently agreed, however, to cooperate with the government. The terms of his cooperation agreement required that he disgorge the $25,000 profit from his purchase and sale of Waldbaum stock and pay a $25,000 fine.

A grand jury returned an indictment on July 20, 1988, charging Chestman with the following counts of insider trading and perjury: ten counts of fraudulent trading in connection with a tender offer in violation of Rule 14e–3(a), ten counts of securities fraud in violation of Rule 10b–5, ten counts of mail fraud, and one count of perjury in connection with his testimony before the SEC. The district court thereafter denied Chestman's motion to dismiss the indictment. 704 F.Supp. 451 (S.D.N.Y.1989). After a jury trial, Chestman was found guilty on all counts.

Chestman appealed. He claimed that Rule 14e–3(a) was invalid because the SEC had exceeded its statutory authority in promulgating a rule that dispensed with one of the common law elements of fraud. He also argued that there was insufficient evidence to sustain his Rule 10b–5, mail fraud and perjury convictions.

A panel of this Court reversed Chestman's convictions on all counts, issuing three separate opinions on the Rule 14e–3(a) charges. 903 F.2d 75 (2d Cir.1990). Familiarity with the panel's opinions is assumed.

A majority of the active judges of the Court voted to rehear *in banc* the panel's decision with respect to the Rule 14e–3(a), Rule 10b–5, and mail fraud convictions.

We directed the parties to file additional briefs on these issues and heard oral argument on November 9, 1990.

## DISCUSSION

### A. *Rule 14e–3(a)*

Chestman challenges his Rule 14e–3(a) convictions on three grounds. He first contends that the SEC exceeded its rulemaking authority when it promulgated Rule 14e–3(a). He then argues that the government presented insufficient evidence to support these convictions. Finally, he contends that his convictions should be overturned on due process notice grounds. We begin with his facial attack on the validity of Rule 14e–3(a).

#### 1. Validity of Rule 14e–3(a)

■ Chestman's first challenge concerns the validity of a rule prescribed by the SEC pursuant to a congressional delegation of rulemaking authority. The question presented is whether Rule 14e–3(a) represents a proper exercise of the SEC's statutory authority. While we have not heretofore addressed this question, several district court judges in this Circuit have concluded that Rule 14e–3(a) represents a valid exercise of rulemaking authority. *See United States v. Marcus Schloss & Co., Inc.*, 710 F.Supp. 944, 955–57 (S.D.N.Y.1989) (Haight, J.); *U.S. v. Chestman*, 704 F.Supp. 451, 454–58 (S.D.N.Y.1989) (Walker, J.). *See also O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1190–91 (S.D.N.Y.1981) (Lasker, J.) (rejecting contention that Rule 14e–3 exceeds the scope of section 14(e) because the rule covers transactions on the open market, and not just transactions between the tender offeror and a shareholder of a target company).

The enabling statutes for Rule 14e–3(a) are section 14(e) and section 23(a)(1) of the 1934 Act. Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circum-

stances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e). The first sentence of section 14(e) is a self-operative provision, which Congress enacted as part of the Williams Act, Pub.L. No. 90–439, 82 Stat. 454 (1968). Congress added the second sentence, a rulemaking provision, in 1970. Section 23(a)(1), in turn, authorizes the SEC "to make such rules and regulations as may be necessary or appropriate to implement the provisions of this chapter for which [it is] responsible or for the execution of the functions vested in [it] by this chapter." 15 U.S.C. § 78w(a)(1).

Acting pursuant to the authority granted by sections 14(e) and 23(a)(1), the SEC promulgated Rule 14e–3 in 1980. Rule 14e–3(a), the subsection under which Chestman was convicted, provides:

If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

 (1) The offering person,

 (2) The issuer of the securities sought or to be sought by such tender offer, or

 (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be

purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e–3(a).

One violates Rule 14e–3(a) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired "directly or indirectly" from an insider of the offeror or issuer, or someone working on their behalf. Rule 14e–3(a) is a disclosure provision. It creates a duty in those traders who fall within its ambit to abstain or disclose, without regard to whether the trader owes a pre-existing fiduciary duty to respect the confidentiality of the information. Chestman claims that the SEC exceeded its authority in drafting Rule 14e–3(a)—more specifically, in drafting a rule that dispenses with one of the common law elements of fraud, breach of a fiduciary duty.

In reviewing this claim, our scope of review is limited. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (upholding the EPA's construction of the Clean Air Act term "stationary source"). When Congress delegates to an agency the power to promulgate rules,

the [agency] adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner....

The [rule] is therefore entitled to more than mere deference or weight. It can be set aside only if the [agency] exceeded

[its] statutory authority or if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Batterton v. Francis,* 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977) (internal citations omitted) (quoting 5 U.S.C. § 706(2)(A), (C)) (upholding the power of the Secretary of Health, Education and Welfare to prescribe "standards" for determining what constitutes "unemployment" for purposes of benefit eligibility). We thus will reject only those rules that are " 'inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.' " *Securities Industry Ass'n v. Board of Governors,* 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). *See also* 2 K. Davis, *Administrative Law Treatise* § 7:8, at 37 (2d ed. 1979) (noting the deferential standard of review for "legislative rules"). Furthermore, we remain mindful that, in construing legislation, we must " 'give effect, if possible, to every clause and word of a statute.' " *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1882)). Keeping these principles in mind, we consider whether Congress authorized the SEC to enact Rule 14e–3(a).

The plain language of section 14(e) represents a broad delegation of rulemaking authority. The statute explicitly directs the SEC to "define" fraudulent practices and to "prescribe means reasonably designed to prevent" such practices. It is difficult to see how the power to "define" fraud could mean anything less than the power to "set forth the meaning of" fraud in the tender offer context. *See Webster's Third New International Dictionary* 592 (1971). This delegation of rulemaking responsibility becomes a hollow gesture if we cabin the SEC's rulemaking authority, as Chestman urges we should, by common law definitions of fraud. Under Chestman's construction of the statute, the separate grant of rulemaking power would be rendered superfluous because the SEC could never define as fraud anything not already prohibited by the self-operative provision. Such a narrow construction of the congressional grant of authority would cramp the SEC's ability to define fraud flexibly in the context of the discrete and highly sensitive area of tender offers. And such a delegation of "power," paradoxically, would allow the SEC to limit, but not extend, a trader's duty to disclose.

Even if we were to accept the argument that the SEC's definitional authority is circumscribed by common law fraud, which we do not, the SEC's power to "prescribe means reasonably designed to prevent" fraud extends the agency's rulemaking authority further. The language of this portion of section 14(e) is clear. The verb "prevent" has a plain meaning: "[T]o keep from happening or existing esp[ecially] by precautionary measures." *Webster's New Third International Dictionary* 1798 (1971). A delegation of authority to enact rules "reasonably designed to prevent" fraud, then, necessarily encompasses the power to proscribe conduct outside the purview of fraud, be it common law or SEC-defined fraud. Because the operative words of the statute, "define" and "prevent," have clear connotations, the language of the statute is sufficiently clear to be dispositive here. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. We note, however, other factors that bolster our interpretation.

Nothing in the legislative history of section 14(e) indicates that the SEC frustrated congressional intent by enacting Rule 14e–3(a). To the contrary, what legislative history there is suggests that Congress intended to grant broad rulemaking authority to the SEC in this instance.

As originally enacted, section 14(e) was part of the Williams Act. The Williams Act, the Supreme Court has concluded, was "a disclosure provision," *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 27, 97 S.Ct. 926, 942, 51 L.Ed.2d 124 (1977), whose "sole purpose ... was the protection of investors who are confronted with a tender

offer." *Id.* at 35, 97 S.Ct. at 946. Although the legislative history "specifically concerning § 14(e) is sparse," *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 11, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985), the congressional reports indicate that section 14(e) was directed at ensuring *"full disclosure"* in connection with the trading of the securities of a tender offer target. *Id.* (quoting H.R.Rep. No. 1711, 90th Cong., 2nd Sess. 11 (1968); S.Rep. No. 550, 90th Cong., 1st Sess. 11 (1967) U.S.Code Cong. & Admin.News 1968, 2811) (emphasis supplied by Supreme Court). Analyzing the legislative history of section 14(e), the *Schreiber* Court explained:

> Section 14(e) adds a "broad antifraud prohibition" modeled on the antifraud provisions of § 10(b) of the Act and Rule 10b–5.... It supplements the more precise disclosure provisions found elsewhere in the Williams Act, while requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b).

*Id.* at 10–11, 105 S.Ct. at 2463–64 (quoting *Piper*, 430 U.S. at 24, 97 S.Ct. at 940) (footnote omitted). The "very purpose of the [Williams] Act," we have said, was "informed decisionmaking by shareholders." *Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir.) (per curiam), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980).

The legislative history of the 1970 amendment to section 14(e), the rulemaking provision, likewise suggests a broad grant of congressional authority. Senator Williams, the bill's sponsor, asserted the "utmost necessity" of granting "full rulemaking powers" to the SEC in the area of tender offers. 116 Cong.Rec. 3024 (Feb. 10, 1970). The amendment "would add to the Commission's rulemaking power," Senator Williams explained, "and enable it to deal promptly and ... flexib[ly]" with problems in that area. Hearings on S.3431 before the Subcom. on Securities of the Senate Comm. on Banking and Currency, 91st Cong., 2nd Sess. 2 (1970) [hereinafter S.3431 Hearings]; *see also* H.R.Rep. No. 1655, 91st Cong., 2nd Sess. 4, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5025, 5028. During hearings on the 1970

Amendment, moreover, Senator Williams asked the SEC chairman for "examples of the fraudulent, deceptive, or manipulative practices used in tender offers which the proposed [SEC] rulemaking powers would prevent," noting that the information "would be most helpful to the committee as we continue developing this legislation." S. 3431 Hearings, at 11. Responding to the Senator's request, the SEC identified one such "problem" that the SEC's proposed rulemaking authority would be used to prevent:

> The person who has become aware that a tender bid is to be made, or has reason to believe that such bid will be made, may fail to disclose material facts with respect thereto to persons who sell to him securities for which the tender bid is to be made.

*Id.* at 12. Notably, this hypothetical does not contain any requirement that the trader breach a fiduciary duty. All told, the legislative history indicates that Congress intended to grant broad rulemaking power to the SEC under section 14(e). This delegation of authority was aimed at promoting full disclosure in the tender offer context and, in so doing, contributing to informed decisionmaking by shareholders.

In promulgating Rule 14e–3(a), the SEC acted well within the letter and spirit of section 14(e). Recognizing the highly sensitive nature of tender offer information, its susceptibility to misuse, and the often difficult task of ferreting out and proving fraud, Congress sensibly delegated to the SEC broad authority to delineate a penumbra around the fuzzy subject of tender offer fraud. *See generally* Loewenstein, *Section 14(e) of the Williams Act and the Rule 10b–5 Comparisons*, 71 Geo.L.J. 1311, 1356 (1983) ("It is difficult to see why Congress would grant such broad powers to the SEC if the SEC was not expected to have some leeway in utilizing its powers."). To be certain, the SEC's rulemaking power under this broad grant of authority is not unlimited. The rule must still be "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93

S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525–26, 21 L.Ed.2d 474 (1969)). The SEC, however, in adopting Rule 14e–3(a), acted consistently with this authority. While dispensing with the subtle problems of proof associated with demonstrating fiduciary breach in the problematic area of tender offer insider trading, the Rule retains a close nexus between the prohibited conduct and the statutory aims.

Legislative activity since the SEC promulgated Rule 14e–3(a) further supports the Rule's validity. Congress acknowledged and left untouched the force of Rule 14e–3(a) when it enacted the Insider Trading Sanctions Act of 1984 (ITSA), 15 U.S.C. § 78u–1. ITSA imposes treble civil penalties on those who violate SEC rules "by purchasing or selling a security while in possession of material, nonpublic information," *id.* § 78u–1(a)(1), an activity covered by Rule 14e–3(a). Congress, in fact, was advised that a Rule 14e–3 violation would trigger treble damages under ITSA. *See* H.R.Rep. No. 355, 98th Cong., 1st Sess. 4, 11, 13 n. 20, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2274, 2277, 2284, 2286 n. 20; *see also* H.R.Rep. No. 910, 100th Cong., 2nd Sess. 14, *reprinted in* 1988 U.S.Code Cong. & Admin.News 6043, 6051 (in enacting the Insider Trading and Securities Fraud Enforcement Act of 1988, Congress noted that Rule 14e–3 had triggered efforts by private securities firms "to detect insider trading and other market abuses by their employees").

These references to Rule 14e–3 during debates on proposed insider trading legislation may not amount to congressional ratification of the Rule, *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 1801–03, 23 L.Ed.2d 371 (1969), but they do support the Rule's validity. Congressional silence in the face of administrative construction of a statute lends support to the validity of that interpretation. *See United States v. Rutherford*, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) ("once an agency's statutory construction has been 'fully brought to the attention of the public

and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned") (citations omitted); *Red Lion Broadcasting Co.*, 395 U.S. at 381, 89 S.Ct. at 1802; *Zemel v. Rusk*, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965) ("Congress' failure to repeal or revise in the face of … administrative interpretation has been held to constitute persuasive evidence that that interpretation is the one intended by Congress.").

In sum, the language and legislative history of section 14(e), as well as congressional inactivity toward it since the SEC promulgated Rule 14e–3(a), all support the view that Congress empowered the SEC to prescribe a rule that extends beyond the common law.

Chestman points to nothing in the language or legislative history of section 14(e) to refute our construction of the statute. Instead he relies principally on *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Schreiber*, 472 U.S. 1, 105 S.Ct. 2458, to advance his argument that section 14(e) parallels common law fraud. That reliance is misplaced.

*Chiarella* considered whether trading stock on the basis of material nonpublic information in the absence of a fiduciary breach constitutes fraud under section 10(b). Confronted with both congressional and SEC silence on the issue, *see* section 10(b) and Rule 10b–5, the Court applied common law principles of fraud. It concluded, based on those principles, that liability under section 10(b) requires a fiduciary breach.

Several factors limit *Chiarella*'s precedential value in this case. First, *Chiarella* of course concerns section 10(b), not section 14(e). Section 10(b) is a general antifraud statute, while section 14(e) is an antifraud provision specifically tailored to the field of tender offers, an area of the securities industry that, the Williams Act makes clear, deserves special regulation.

Second, section 14(e) evinces a clear indication of congressional intent, while section 10(b) does not. *See Chiarella*, 445 U.S. at 226, 100 S.Ct. at 1113 ("neither the legislative history nor the statute itself affords specific guidance for the resolution of this case"). Section 10(b) speaks in terms of the use "in connection with the purchase or sale of any security" of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Section 14(e) directly proscribes, in self-operative fashion, "any fraudulent, deceptive, or manipulative acts or practices" in connection with a tender offer. Then, in a separate sentence, the statute directs the SEC to draft rules to define these practices and to prevent them: "The [SEC] shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." The contrast in statutory language is telling. It underscores, first of all, the dubious premise of Chestman's argument—that section 14(e) was modeled after section 10(b). The two provisions are hardly identical in scope. The language of section 14(e)'s rulemaking provision, instead of tracking section 10(b), in fact mirrors section 15(c)(2), 15 U.S.C. § 78*o*(c)(2), which concerns broker-dealer relations. "The language of the addition to section 14(e) is identical to that contained in section 15(c)(2) of the Securities Exchange Act concerning practices of brokers and dealers in securities transactions in the over-the-counter markets." H.R.Rep. No. 1655, 91st Cong., 2nd Sess. 4, *reprinted in* 1970 U.S.Code Cong. & Admin.News 5025, 5028. The contrast also illustrates that section 14(e) provides a more compelling legislative delegation to the SEC to prescribe rules than does section 10(b). While section 10(b) refers to such rules as the SEC "may prescribe as necessary or appropriate," section 14(e) commands the SEC to prescribe rules that will "define" and "prevent" fraud. *See* Loewenstein, *supra*, 71 Geo.L.J. at 1356

("By comparison, the Commission's rulemaking authority under section 10(b) does not include the power to define manipulative or deceptive" acts or to adopt prophylatic measures.).

Indeed, in *Chiarella*, the Court even distinguished sections 10(b) and 14(e). The Court acknowledged that the SEC had recently acted pursuant to its rulemaking authority under section 14(e) to bar warehousing, a form of insider trading involving tender offers:

> In this case, as in warehousing, a buyer of securities purchases stock in a target corporation on the basis of market information which is unknown to the seller. In both of these situations, the seller's behavior presumably would be altered if he had the nonpublic information. Significantly, however, the Commission has acted to bar warehousing under its authority to regulate tender offers [citing proposed Rule 14e–3] after recognizing that action under § 10(b) would rest on a "somewhat different theory" than that previously used to regulate insider trading as fraudulent activity.

*Chiarella*, 445 U.S. at 234, 100 S.Ct. at 1117–18 (footnotes omitted). That "somewhat different theory" is one that does not embrace "any fiduciary duty to [the target] company or its shareholders." 1 SEC Institutional Investor Study Report, H.R.Doc. No. 64, 92nd Cong. 1st Sess., pt. 1, at xxxii (1971) (cited in *Chiarella*, 445 U.S. at 234 n. 19, 100 S.Ct. at 1118 n. 19). Significantly, the *Chiarella* Court did not disapprove of this exercise of the SEC's rulemaking power under section 14(e).

Finally, *Chiarella* faced not only statutory silence on the issue before it but also administrative reticence. Neither the language of Rule 10b–5, SEC discussions of the rule, nor administrative interpretations of the rule offered any evidence that the SEC, in drafting Rule 10b–5, intended the rule to go beyond common law fraud. *See* Rule 10b–5 (referring to "artifice to defraud" and to "fraud ... upon any person"); *see also Chiarella*, 445 U.S. at 226, 100 S.Ct. at 1113 ("When Rule 10b–5 was promulgated in 1942, the SEC did not dis-

562

cuss the possibility that failure to provide information might run afoul of § 10(b).") (footnote omitted); *id.* at 230, 100 S.Ct. at 1115; *id.* 445 U.S. at 233, 100 S.Ct. at 1117 ("neither the Congress nor the Commission ever has adopted a parity-of-information rule"). The language of Rule 14e–3(a), on the other hand, reveals express SEC intent to proscribe conduct not covered by common law fraud. And "[p]resumably the SEC perceived Rule 14e–3 as a valid exercise of its statutory authority." *United States v. Marcus Schloss & Co., Inc.*, 710 F.Supp. 944, 956 (S.D.N.Y.1989).

Thus, the question presented here differs markedly from that presented in *Chiarella*. It is not whether section 14(e), standing alone, prohibits insider trading in the absence of a fiduciary breach. It is whether section 14(e)'s broad rulemaking provision, together with SEC action under that authority in the form of Rule 14e–3(a), represent a valid exercise of administrative rulemaking. In *Chiarella*, the Court refused to recognize "a general duty between all participants in market transactions to forgo actions based on material nonpublic information ... absent some explicit evidence of congressional intent." 445 U.S. at 233, 100 S.Ct. at 1117. Our task is easier. Rule 14e–3(a) creates a narrower duty than that once proposed for Rule 10b–5—a parity of information rule—and, as the language and legislative history of section 14(e) make clear, the rule has Congress' blessing.

Equally unavailing is Chestman's reliance on *Schreiber*. The *Schreiber* case arose from a hostile tender offer initiated by Burlington Northern, Inc. for El Paso Gas Co. stock. After a majority of El Paso's shareholders subscribed to the tender offer, Burlington rescinded its offer, deciding to enter into a friendly takeover agreement with El Paso. Pursuant to its agreement with El Paso, Burlington substituted a new tender offer, which was soon oversubscribed. Several shareholders who had tendered their shares during the first tender offer received a diminished payment due to the oversubscription of the second tender offer. They claimed that Burlington's conduct violated section 14(e) as a

"manipulative" distortion of the market for El Paso stock. Absent congressional guidance concerning the meaning of the term "manipulative," it fell to the Court to determine whether misrepresentation or nondisclosure is a necessary element of a violation of section 14(e). *Schreiber*, 472 U.S. at 6–8, 105 S.Ct. at 2461–62. The Court looked to the ordinary and common law meaning of the term, as well as the legislative history of section 14(e), with its focus on nondisclosure. Relying on these sources, the Court held that misrepresentation or nondisclosure was an indispensable element of a section 14(e) violation. *Id.* at 8, 105 S.Ct. at 2462.

Chestman claims that *Schreiber* demonstrates that section 14(e), like section 10(b), projects no further than common law fraud. To support this argument, he points to a statement in *Schreiber* indicating that section 14(e) is "modeled on the antifraud provisions of § 10(b)." *Id.* at 10, 105 S.Ct. at 2463. What Chestman ignores, however, is that *Schreiber* contrasted as well as compared the two statutes. Following the language Chestman quotes, the Court stated that section 14(e) "supplements" the other disclosure provisions in the Williams Act and requires "disclosure more explicitly addressed to the tender offer context than that required by § 10(b)." *Id.* at 10–11, 105 S.Ct. at 2464. In addition, the Court's reference to the similarity between sections 10(b) and 14(e) only refers to section 14(e)'s substantive provision. Section 10(b), as we have emphasized, lacks a separate rulemaking grant akin to section 14(e). Moreover, even to the extent section 10(b) may be accurately described as the father of section 14(e), as well as all later antifraud provisions under the 1934 Act, we cannot agree that section 10(b) therefore confines section 14(e), and its other antifraud progeny, to an identical reach.

Chestman also attempts to draw support from footnote 11 in *Schreiber*. There, in rejecting petitioner's argument that the 1970 amendment to section 14(e), the rulemaking provision, would be meaningless if section 14(e) concerned disclosure only, the Court observed:

In adding the 1970 amendment, Congress simply provided a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or nondisclosure. The amendment gives the [SEC] latitude to regulate nondeceptive activities as a "reasonably designed" means of preventing manipulative acts, without suggesting any change in the meaning of the term "manipulative" itself.

*Id.* at 11 n. 11, 105 S.Ct. at 2464 n. 11. Whatever may be gleaned from the footnote on the SEC's definitional authority under section 14(e), the footnote plainly endorses the SEC's authority to draft prophylactic rules under section 14(e). It states that the rulemaking provision "gives the [SEC] latitude to regulate *nondeceptive* activities as a 'reasonably designed' means of preventing manipulative acts." *Id.* (emphasis added). Chestman offers no persuasive explanation why the authority "to regulate nondeceptive activities" would not also allow the SEC to regulate *nonfraudulent* conduct.

As for the SEC's authority to define the operative words of section 14(e), *Schreiber* seems to be saying only that section 14(e)'s rulemaking provision does not itself change the common law meaning of "manipulative." The Court was not confronted with the question raised here—whether SEC action pursuant to the rulemaking delegation exceeds statutory authority—because the petitioner did not point to any SEC rules drafted under section 14(e) that covered Burlington's activities. Moreover, even if we were to agree with Chestman that, under *Schreiber,* the common law confines the SEC in defining "manipulative," we would still uphold the validity of Rule 14e–3(a). In *Schreiber,* the definition of "manipulative" proffered by the plaintiff would have eliminated a requirement that there be a nondisclosure or material misrepresentation, the primary evils at which section 14(e) took aim. Rule 14e–3(a), in contrast, does not stray from congressional intent; it remains a disclosure provision.

Therefore, based on the plain language of section 14(e), and congressional activity both before section 14(e) was enacted and after Rule 14e–3(a) was promulgated, we hold that the SEC did not exceed its statutory authority in drafting Rule 14e–3(a).

### 2. Sufficiency of the Evidence

■ Chestman also argues that the evidence was insufficient to sustain his Rule 14e–3(a) convictions. In an argument raised for the first time in his *in banc* brief, Chestman contends that the government failed to present sufficient evidence to show that he knew that the information had been acquired "directly or indirectly" from the Waldbaum company, a Waldbaum company insider, or a person acting on the company's behalf. This argument merits only brief consideration.

The jury heard the following evidence. Chestman knew that Keith Loeb was a member of the Waldbaum family. Chestman knew that the information concerned the Waldbaum family business. He also knew that the information was not publicly available. Furthermore, he had heard Loeb describe the information as "definite" and "accurate." While more than one inference could be drawn from this evidence, the jury's conclusion was far from an irrational one. A jury could reasonably infer that Chestman knew that the information originated from a Waldbaum insider. We disagree with Chestman's intimation that Loeb had to describe the information to Chestman as "confidential." A description of the information as "definite" and "accurate," together with Chestman's knowledge that Loeb was a Waldbaum relative, provided the crucial basis from which to infer confidentiality. It was not necessary that Chestman be told the family channels through which the information had travelled. In sum, Chestman's knowledge of Loeb's status as a Waldbaum family member and the nature of the information conveyed provided sufficient evidence from which a rational trier of fact could infer that the information originated, "directly or indirectly," from a Waldbaum insider.

### 3. Due Process

■ Chestman next argues that his Rule 14e–3(a) convictions violate due process be-

cause he did not have fair notice that his conduct was criminal. Given the explicit language of Rule 14e–3(a), we also reject this claim.

The purpose of the "fair notice" requirement of due process is "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). That requirement was met here. As we have seen, Rule 14e–3(a) explicitly proscribes trading on the basis of material nonpublic information derived from insider sources. Unlike Rule 10b–5, Rule 14e–3(a) is not a general, catchall provision. It targets specific conduct arising in a unique context—tender offers. The language of the rule gave Chestman, a sophisticated stockbroker, fair notice that the conduct in which he engaged was criminal.

■ That leaves Chestman with the dubious argument that, while he had notice that Rule 14e–3(a) prohibited his activity, he could not have known whether a court would find the rule valid. Due process does not extend this far. When statutory language provides notice that conduct is illegal, the notice requirements of due process have been met. The government need not await every conceivable challenge to a law's validity before it prosecutes conduct covered by a statute. Chestman "treaded closely enough along proscribed lines ... to find that [he] had adequate notice of the illegality of [his] acts." *United States v. Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

### B. *Rule 10b–5*

Chestman's Rule 10b–5 convictions were based on the misappropriation theory, which provides that "one who misappropriates nonpublic information in breach of a fiduciary duty and trades on that information to his own advantage violates Section 10(b) and Rule 10b–5." *SEC v. Materia*, 745 F.2d 197, 203 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). With respect to the shares Chestman purchased on behalf of Keith Loeb, Chestman was convicted of aiding and abetting Loeb's misappropriation of nonpublic information in breach of a duty Loeb owed to the Waldbaum family and to his wife Susan. As to the shares Chestman purchased for himself and his other clients, Chestman was convicted as a "tippee" of that same misappropriated information. Thus, while Chestman is the defendant in this case, the alleged misappropriator was Keith Loeb. The government agrees that Chestman's convictions cannot be sustained unless there was sufficient evidence to show that (1) Keith Loeb breached a duty owed to the Waldbaum family or Susan Loeb based on a fiduciary or similar relationship of trust and confidence, and (2) Chestman knew that Loeb had done so. We have heretofore never applied the misappropriation theory—and its predicate requirement of a fiduciary breach—in the context of family relationships. As a prologue to that analysis, we canvass past Rule 10b–5 jurisprudence.

Section 10(b) prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to that mandate, the SEC promulgated Rule 10b–5, which, in pertinent part, makes it unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act ... which operates ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.-10b–5 (1988). While more than one interpretation has been given to this expansive language, fraud has remained the centerpiece of a Rule 10b–5 criminal violation. At this juncture, two general theories of Rule 10b–5 fraud have emerged to fill the interstitial gaps of the rule.

#### 1. Traditional Theory of Rule 10b–5 Liability

■ The traditional theory of insider trader liability derives principally from the Supreme Court's holdings in *Chiarella*, 445

U.S. 222, 100 S.Ct. 1108, and *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). A securities trader commits Rule 10b–5 fraud, the *Chiarella* Court held, only if he "fails to disclose material information prior to the consummation of a transaction ... when he is under a duty to do so." *Chiarella,* 445 U.S. at 228, 100 S.Ct. at 1114. The *Chiarella* Court then delineated when a person possessing material nonpublic information owes such a duty—what it called "[t]he obligation to disclose or abstain" from trading. *Id.* at 227, 100 S.Ct. at 1114. It held that this duty "does not arise from the mere possession of nonpublic market information." *Id.* at 235, 100 S.Ct. at 1118. That is, the duty inquiry does not turn on whether the parties to the transaction have "equal information." *Dirks,* 463 U.S. at 657, 103 S.Ct. at 3263 (construing *Chiarella* ). Rather, a duty to disclose or abstain arises only from " 'a fiduciary or other similar relation of trust and confidence between [the parties to the transaction].' " *Chiarella,* 445 U.S. at 228, 100 S.Ct. at 1114 (quoting Restatement (Second) of Torts § 551(2)(a) (1976)).

In *Dirks,* an action concerning the liability of a tippee of material nonpublic information, the Court built on its holding in *Chiarella. Dirks* again rejected a parity of information theory of Rule 10b–5 liability, reiterating the "requirement of a specific relationship between the shareholders and the individual trading on inside information." *Dirks,* 463 U.S. at 655, 103 S.Ct. at 3261. It then examined when a tippee inherits a fiduciary duty to the corporation's shareholders to disclose or refrain from trading. Noting the "derivative" nature of tippee liability, *id.* at 659, 103 S.Ct. at 3264, the Court held that tippee liability attaches only when an "insider has breach-ed his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." *Id.* at 660, 103 S.Ct. at 3264.

*Dirks* established, in *dictum,* an additional means by which erstwhile outsiders become fiduciaries of a corporation's shareholders. Justice Powell explained:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.... For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

*Id.* at 655 n. 14, 103 S.Ct. at 3262 n. 14 (citations omitted). This theory clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of "a special confidential relationship." The temporary insider thereby acquires a correlative fiduciary duty to the corporation's shareholders.

Binding these strands of Rule 10b–5 liability are two principles—one, the predicate act of fraud must be traceable to a breach of duty to the purchasers or sellers of securities,[2] two, a fiduciary duty does

---

**2.** The insider's fiduciary duties, it should be noted, run to a buyer (a shareholder-to-be) and to a seller (a pre-existing shareholder) of securities, even though the buyer technically does not have a fiduciary relationship with the insider prior to the trade. As the Court explained in *Chiarella:*

> The transaction in *Cady, Roberts* involved sale of stock to persons who previously may not have been shareholders in the corporation. The Commission embraced the reasoning of

Judge Learned Hand that "the director or officer assumed a fiduciary relation to the buyer by the very sale; for it would be a sorry distinction to allow him to use the advantage of his position to induce the buyer into the position of a beneficiary although he was forbidden to do so once the buyer had become one."

445 U.S. at 227 n. 8, 100 S.Ct. at 1114 n. 8 (quoting *Cady, Roberts & Co.,* 40 S.E.C. 907, 914 n. 23 (1961) (quoting *Gratz v. Claughton,* 187

not run to the purchasers or sellers solely as a result of one's possession of material nonpublic information.

### 2. Misappropriation Theory

█ The second general theory of Rule 10b–5 liability, the misappropriation theory, has not yet been the subject of a Supreme Court holding,[3] but has been adopted in the Second, Third, Seventh and Ninth Circuits. *See, e.g., SEC v. Cherif,* 933 F.2d 403 (7th Cir.1991); *SEC v. Clark,* 915 F.2d 439 (9th Cir.1990); *Rothberg v. Rosenbloom,* 771 F.2d 818 (3d Cir.1985), *rev'd on other grounds after remand,* 808 F.2d 252 (3d Cir.1986), *cert. denied,* 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987); *United States v. Newman,* 664 F.2d 12 (2d Cir. 1981), *aff'd after remand,* 722 F.2d 729 (2d Cir.1983), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). Under this theory, a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction. *See, e.g., Carpenter,* 791 F.2d at 1028–29; *Materia,* 745 F.2d at 201; *Newman,* 664 F.2d at 17–18. In contrast to *Chiarella* and *Dirks,* the misappropriation theory does not require that the buyer or seller of securities be defrauded. *Newman,* 664 F.2d at 17. Focusing on the language "fraud or deceit upon *any* person" (emphasis added), we have held that the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities. *See Carpenter,* 791 F.2d at 1032. To date we have applied the theory only in the context of employment relationships. *See Carpenter,* 791 F.2d at 1032 (financial columnist breached duty to his newspaper); *Materia,* 745 F.2d at 202 (copyholder breached duty to his printing

company); *Newman,* 664 F.2d at 17 (investment banker breached duty to his firm). District courts in this Circuit have applied the theory in other settings as well as in the employment context. *See, e.g., United States v. Willis,* 737 F.Supp. 269 (S.D.N.Y.1990) (denying motion to dismiss indictment of psychiatrist who traded on the basis of information obtained from patient, in breach of duty arising from relationship of trust and confidence); *United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985) (allegation that son breached fiduciary duty to father, a corporate director, withstood motion to dismiss indictment); *SEC v. Musella,* 578 F.Supp. 425 (S.D.N.Y.1984) (office services manager of law firm breached duty to law firm and its clients by trading on the basis of material nonpublic information acquired in the course of his employment).

One point at which the misappropriation theory and the traditional theory of insider trading merge warrants brief consideration. Our first applications of the misappropriation theory, in *Newman* and *Materia,* concerned conduct that occurred before the Supreme Court's holding in *Dirks. Dirks* noted that an outsider could obtain temporary insider status by gaining access to confidential information through certain relationships with a corporation—as, for example, an underwriter, lawyer or consultant. 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. A temporary insider theory of prosecution might well have covered the activities of the investment banker in *Newman* and the printer in *Materia.* In *Newman* and *Materia,* the defendants appeared to have "entered into a special confidential relationship in the conduct of the business of the enterprise and [were] given access to information solely for corporate purposes." *Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. In view of the

F.2d 46, 49 (2d Cir.), *cert. denied,* 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951))) (internal citation omitted).

**3.** In *Carpenter v. United States,* 484 U.S. 19, 24, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987), an "evenly divided" Court affirmed the securities fraud convictions brought pursuant to the mis-

appropriation theory. An affirmance by an evenly divided court is "not entitled to precedential weight." *See Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 379, 34 L.Ed.2d 401 (1972). Thus, Supreme Court support for the misappropriation theory is still unclear.

overlap between *Newman* and *Materia* on the one hand and the *Dirks* concept of temporary insiders on the other, we arguably did not break ranks with the traditional theory of insider trading until our holding in *Carpenter*. In *Carpenter* none of the prongs of liability under the traditional theory applied. That is, the defendants did not owe the people with whom they traded a duty to disclose or abstain from trading—absent resurrection of the twice-rejected parity of information theory. *Carpenter*, then, represents the first fact pattern we have considered that is clearly beyond the pale of the traditional theory of insider trading.

After *Carpenter*, the fiduciary relationship question takes on special importance. This is because a fraud-on-the-source theory of liability extends the focus of Rule 10b–5 beyond the confined sphere of fiduciary/shareholder relations to fiduciary breaches of any sort, a particularly broad expansion of 10b–5 liability if the add-on, a "similar relationship of trust and confidence," is construed liberally. One concern triggered by this broadened inquiry is that fiduciary duties are circumscribed with some clarity in the context of shareholder relations but lack definition in other contexts. *See generally Reed*, 601 F.Supp. 685 (and authorities cited therein). Tethered to the field of shareholder relations, fiduciary obligations arise within a narrow, principled sphere. The existence of fiduciary duties in other common law settings, however, is anything but clear. Our Rule 10b–5 precedents under the misappropriation theory, moreover, provide little guidance with respect to the question of fiduciary breach, because they involved egregious fiduciary breaches arising solely in the context of employer/employee associations. *See Carpenter*, 791 F.2d at 1028 ("It is clear that defendant Winans ... breached a duty of confidentiality to his employer"); *Newman*, 664 F.2d at 17 ("we need spend little time on the issue of fraud and deceit"); *Materia*, 745 F.2d at 201 (same). For these reasons we tread cautiously in extending the misappropriation theory to new relationships, lest our efforts to construe Rule 10b–5 lose method and

predictability, taking over "the whole corporate universe." *United States v. Chiarella*, 588 F.2d 1358, 1377 (2d Cir.1978) (Meskill, J., dissenting) (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 480, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977)), *rev'd*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

### 3. Fiduciary Duties and Their Functional Equivalent

██ Against this backdrop, we turn to our central inquiry—what constitutes a fiduciary or similar relationship of trust and confidence in the context of Rule 10b–5 criminal liability? We begin by noting two factors that do not themselves create the necessary relationship.

██ First, a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information. *Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir.1980) (applying Delaware law). *Walton* concerned the conduct of an investment bank, Morgan Stanley. While investigating possible takeover targets for one of its clients, Morgan Stanley obtained unpublished material information (internal earnings reports) on a confidential basis from a prospective target, Olinkraft. After its client abandoned the planned takeover, Morgan Stanley was charged with trading in Olinkraft's stock on the basis of the confidential information. Observing that the parties had bargained at "arm's length" and that there had not been a pre-existing agreement of confidentiality between Morgan Stanley and Olinkraft, we rejected the argument that

> Morgan Stanley became a fiduciary of Olinkraft by virtue of the receipt of the confidential information.... [T]he fact that the information was confidential did nothing, in and of itself, to change the relationship between Morgan Stanley and Olinkraft's management. Put bluntly, although, according to the complaint, Olinkraft's management placed its confidence in Morgan Stanley not to disclose the information, Morgan Stanley owed no duty to observe that confidence.

*Walton*, 623 F.2d at 799. *See also Dirks*, 463 U.S. at 662 n. 22, 103 S.Ct. at 3265 n. 22 (citing *Walton* approvingly as "a case

turning on the court's determination that the disclosure did not impose any fiduciary duties on the recipient of the inside information"). Reposing confidential information in another, then, does not by itself create a fiduciary relationship.

 Second, marriage does not, without more, create a fiduciary relationship. " '[M]ere kinship does not of itself establish a confidential relation.' ... Rather, the existence of a confidential relationship must be determined independently of a preexisting family relationship." *Reed,* 601 F.Supp. at 706 (quoting G.G. Bogert, *The Law of Trusts and Trustees* § 482, at 300–11 (Rev. 2d ed. 1978)) (other citations omitted). Although spouses certainly may by their conduct become fiduciaries, the marriage relationship alone does not impose fiduciary status. In sum, more than the gratuitous reposal of a secret to another who happens to be a family member is required to establish a fiduciary or similar relationship of trust and confidence.

We take our cues as to what *is* required to create the requisite relationship from the securities fraud precedents and the common law. *See Chiarella,* 445 U.S. at 227–30, 100 S.Ct. at 1114–16. The common law has recognized that some associations are inherently fiduciary. Counted among these hornbook fiduciary relations are those existing between attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder. *Reed,* 601 F.Supp. at 704 (citing Coffee, *From Tort to Crime: Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics,* 19 Am.Crim. L.Rev. 117, 150 (1981); and Scott, *The Fiduciary Principle,* 37 Cal.L.Rev. 539, 541 (1949)); *Black's Law Dictionary* 564 (5th ed. 1979). While this list is by no means exhaustive, it is clear that the relationships involved in this case—those between Keith and Susan Loeb and between Keith Loeb and the Waldbaum family—were not traditional fiduciary relationships.

 That does not end our inquiry, however. The misappropriation theory requires us to consider not only whether there exists a fiduciary relationship but also whether there exists a "similar relationship of trust and confidence." As the term "similar" implies, a "relationship of trust and confidence" must share the essential characteristics of a fiduciary association. Absent reference to the adjective "similar," interpretation of a "relationship of trust and confidence" becomes an exercise in question begging. Consider: when one en*trusts* a secret (read *confidence*) to another, there then exists a relationship of trust and confidence. *Walton,* however, instructs that entrusting confidential information to another does not, without more, create the necessary relationship and its correlative duty to maintain the confidence. A "similar relationship of trust and confidence," therefore, must be the functional equivalent of a fiduciary relationship. To determine whether such a relationship exists, we must ascertain the characteristics of a fiduciary relationship.

"[A]t the heart of the fiduciary relationship" lies "reliance, and de facto control and dominance." *United States v. Margiotta,* 688 F.2d 108, 125 (2d Cir.1982) (citations omitted) (nonpublic office holder found to owe a fiduciary duty to general citizenry, breach of which created predicate for violation of mail fraud statute) (construing New York law), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). The relation "exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Mobil Oil Corp. v. Rubenfeld,* 72 Misc.2d 392, 400, 339 N.Y.S.2d 623, 632 (Civ.Ct.1972) (discussing fiduciary duty in the franchisee context), *aff'd,* 77 Misc.2d 962, 357 N.Y.S.2d 589 (Sup.Ct.App.1974), *rev'd on other grounds,* 48 A.D.2d 428, 370 N.Y.S.2d 943 (2d Dep't 1975), *aff'd,* 40 N.Y.2d 936, 390 N.Y.S.2d 57, 358 N.E.2d 882 (1976)). One acts in a "fiduciary capacity" when

the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying

and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.

*Black's Law Dictionary* 564 (5th ed. 1979). *See also* 29 U.S.C. § 1002(21)(A) (defining a fiduciary for purposes of ERISA as one "who exercises any discretionary authority or discretionary control").

■■■ A fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. What has been said of an agent's duty of confidentiality applies with equal force to other fiduciary relations: "an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency." Restatement (Second) of Agency § 395 (1958). These characteristics represent the measure of the paradigmatic fiduciary relationship. A similar relationship of trust and confidence consequently must share these qualities.

In *Reed*, 601 F.Supp. 685, the district court confronted the question whether these principal characteristics of a fiduciary relationship—dependency and influence—were necessary factual prerequisites to a similar relationship of trust and confidence. There a member of the board of directors of Amax, Gordon Reed, disclosed to his son on several occasions confidential information concerning a proposed tender offer for Amax. Allegedly relying on this information, the son purchased Amax stock call options. The son was subsequently indicted for violating, among other things, Rule 10b–5 based on breach of a fiduciary duty arising between the father and son. The son then moved to dismiss the indictment, contending that he did not breach a fiduciary duty to his father. The district court sustained the indictment.

■■■ Both the government and Chestman rely on *Reed*. The government draws on *Reed's* application of the misappropriation theory in the family context and its expansive construction of relationships of trust and confidence. Chestman, without challenging the holding in *Reed*, argues that *Reed* cannot sustain his Rule 10b–5 convictions because, unlike Reed senior and junior, Keith and Susan Loeb did not customarily repose confidential business information in one another. Neither party challenges the holding of *Reed*. And we decline to do so *sua sponte*. To remain consistent with our interpretation of a "similar relationship of trust and confidence," however, we limit *Reed* to its essential holding: the repeated disclosure of business secrets between family members may substitute for a factual finding of dependence and influence and thereby sustain a finding of the functional equivalent of a fiduciary relationship. We note, in this regard, that *Reed* repeatedly emphasized that the father and son "frequently discussed business affairs." *Id.* at 690; *see also id.* at 705, 709, 717–18.

We recognize, as *Reed* did, that equity has occasionally established a less rigorous threshold for a fiduciary-like relationship in order to right civil wrongs arising from non-compliance with the statute of frauds, statute of wills and parol evidence rule. *See* Bogert, *supra* § 482, at 286 (explaining that equity's flexible treatment of confidential relationships has been particularly useful in evading the harsh consequences of the statute of frauds). Commenting on the boundless nature of relations of trust and confidence, one scholar observed:

> Equity has never bound itself by any hard and fast definition of the phrase "confidential relation" and has not listed all the necessary elements of such a relation, but has reserved discretion to apply the doctrine whenever it believes that a suitable occasion has arisen.

*Reed*, 601 F.Supp. at 712 n. 38 (quoting G.G. Bogert, *The Law of Trusts and Trustees* § 482, at 284–86 (Rev. 2d ed. 1978)).

Useful as such an elastic and expedient definition of confidential relations, *i.e.*, relations of trust and confidence, may be in the civil context, it has no place in the criminal law. A "suitable occasion" test for determining the presence of criminal fraud would offend not only the rule of lenity but due process as well. *See Chiarella*, 445 U.S. at 235 n. 20, 100 S.Ct. at 1118 n. 20 ("a judicial holding that certain undefined activities 'generally are prohibited' by § 10(b) would raise questions whether either criminal or civil defendants would be given fair notice that they have engaged in illegal activity"). *See also Dirks*, 463 U.S. at 658 n. 17, 103 S.Ct. at 3263 n. 17 (In rejecting an SEC variation on the parity of information theory, the Court wrote: "[T]his rule is inherently imprecise, and imprecision prevents parties from ordering their actions in accord with legal requirements."). More than a perfunctory nod at the rule of lenity, then, is required. We will not apply outer permutations of chancery relief in addressing what is frequently the core inquiry in a Rule 10b–5 criminal conviction— whether a fiduciary duty has been breached.

### 4. Application of the Law of Fiduciary Duties

The alleged misappropriator in this case was Keith Loeb. According to the government's theory of prosecution, Loeb breached a fiduciary duty to his wife Susan and the Waldbaum family when he disclosed to Robert Chestman information concerning a pending tender offer for Waldbaum stock. Chestman was convicted as an aider and abettor of the misappropriation and as a tippee of the misappropriated information. Convictions under both theories, the government concedes, required the government to establish two critical elements—Loeb breached a fiduciary duty to Susan Loeb or to the Waldbaum family and Chestman knew that Loeb had done so.

Chestman challenges the sufficiency of the evidence to establish each of these elements of the convictions. Although such a challenge carries a "heavy burden," *United States v. Chang An–Lo*, 851 F.2d 547, 553 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988), that burden was carried here.

We have little trouble finding the evidence insufficient to establish a fiduciary relationship or its functional equivalent between Keith Loeb and the Waldbaum family. The government presented only two pieces of evidence on this point. The first was that Keith was an extended member of the Waldbaum family, specifically the family patriarch's (Ira Waldbaum's) "nephew-in-law." The second piece of evidence concerned Ira's discussions of the business with family members. "My children," Ira Waldbaum testified, "have always been involved with me and my family and they know we never speak about business outside of the family." His earlier testimony indicates that the "family" to which he referred were his "three children who were involved in the business."

Lending this evidence the reasonable inferences to which it is entitled, *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.), *cert. denied*, 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989), it falls short of establishing the relationship necessary for fiduciary obligations. Kinship alone does not create the necessary relationship. The government proffered nothing more to establish a fiduciary-like association. It did not show that Keith Loeb had been brought into the family's inner circle, whose members, it appears, discussed confidential business information either because they were kin or because they worked together with Ira Waldbaum. Keith was not an employee of Waldbaum and there was no showing that he participated in confidential communications regarding the business. The critical information was gratuitously communicated to him. The disclosure did not serve the interests of Ira Waldbaum, his children or the Waldbaum company. Nor was there any evidence that the alleged relationship was characterized by influence or reliance of any sort. Measured against the principles of fiduciary relations, the evidence does not support a finding that Keith Loeb and the

Waldbaum family shared either a fiduciary relation or its functional equivalent.

■ The government's theory that Keith breached a fiduciary duty of confidentiality to Susan suffers from similar defects. The evidence showed: Keith and Susan were married; Susan admonished Keith not to disclose that Waldbaum was the target of a tender offer; and the two had shared and maintained confidences in the past.

Keith's status as Susan's husband could not itself establish fiduciary status. Nor, absent a pre-existing fiduciary relation or an express agreement of confidentiality, could the coda—"Don't tell." That leaves the unremarkable testimony that Keith and Susan had shared and maintained generic confidences before. The jury was not told the nature of these past disclosures and therefore it could not reasonably find a relationship that inspired fiduciary, rather than normal marital, obligations.

■ In the absence of evidence of an explicit acceptance by Keith of a duty of confidentiality, the context of the disclosure takes on special import. While acceptance may be implied, it must be implied from a pre-existing fiduciary-like relationship between the parties. Here the government presented the jury with insufficient evidence from which to draw a rational inference of implied acceptance. Susan's disclosure of the information to Keith served no purpose, business or otherwise. The disclosure also was unprompted. Keith did not induce her to convey the information through misrepresentation or subterfuge. Superiority and reliance, moreover, did not mark this relationship either before or after the disclosure of the confidential information. Nor did Susan's dependence on Keith to act in her interests for some purpose inspire the disclosure. The government failed even to establish a pattern of sharing business confidences between the couple. The government, therefore, failed to offer sufficient evidence to establish the functional equivalent of a fiduciary relation.

In sum, because Keith owed neither Susan nor the Waldbaum family a fiduciary duty or its functional equivalent, he did not defraud them by disclosing news of the pending tender offer to Chestman. Absent a predicate act of fraud by Keith Loeb, the alleged misappropriator, Chestman could not be derivatively liable as Loeb's tippee or as an aider and abettor. Therefore, Chestman's Rule 10b–5 convictions must be reversed.

## C. Mail Fraud

■ The fortunes of Chestman's mail fraud convictions are tied closely to his securities fraud convictions. "Chestman's mail fraud convictions," the government concedes, "were based on the same theory as his Rule 10b–5 convictions." The same fraudulent scheme that underlay the Rule 10b–5 convictions also was the basis for the mail fraud convictions. A scheme to misappropriate material nonpublic information in breach of a fiduciary duty of confidentiality may indeed constitute a fraudulent scheme sufficient to sustain a mail fraud conviction. See Carpenter, 484 U.S. at 27–28, 108 S.Ct. at 321–22; Newman, 664 F.2d at 19. However, whatever ethical obligation Loeb may have owed the Waldbaum family or Susan Loeb, it was too ethereal to be protected by either the securities or mail fraud statutes.

## CONCLUSION

Accordingly, we affirm the Rule 14e–3(a) convictions and reverse the Rule 10b–5 and mail fraud convictions. The reversal of these convictions does not warrant reconsideration of the sentence since the sentences on the Rule 10b–5 and mail fraud convictions are concurrent with the sentences in the Rule 14(e)–3(a) counts. The panel's reversal of the perjury conviction remains intact.

WINTER, Circuit Judge (joined by OAKES, Chief Judge, NEWMAN, KEARSE, and McLAUGHLIN, Circuit Judges), concurring in part and dissenting in part:

I concur in the decision to affirm Chestman's convictions under Section 14(e) of the

Securities Exchange Act of 1934 ("'34 Act"), and under Rule 14e–3. I respectfully dissent, however, from the reversals of his convictions under Section 10(b) and under the mail fraud statute, 18 U.S.C. § 1341 (1988).

## 1) INSIDER TRADING

The difficulty this court finds in resolving the issues raised by this appeal stems largely from the history of the development of the law concerning insider trading. For that reason, I begin by tracing that history in somewhat tiresome fashion.

### a) Statutory Law and Caselaw

The legal rules governing insider trading under Section 10(b) are based solely on administrative and judicial caselaw. This caselaw establishes that some trading on material nonpublic information is illegal and some is not. The line between the two is less than clear. Although Congress has enhanced the penalties for illegal insider trading, see Insider Trading Sanctions Act of 1984, Pub.L. No. 98–376, 98 Stat. 1264,[1] it has not defined the criteria by which legal insider trading is separated from illegal trading. And, although the Securities and Exchange Commission ("SEC") seems to take a somewhat more expansive view of what is illegal than the courts, see Complaint in SEC v. Phillip J. Stevens, No. 91 Civ. 1869 (S.D.N.Y. filed Mar. 19, 1991) (insider trading suit where sole allegation of benefit to insider was that selective leaking would enhance insider's reputation); see also Coffee, The SEC and the Securities Analyst, N.Y.L.J. May 30, 1991, at 5, col. 1, the SEC has, apart from Rule 14e–3, forgone the opportunity to use its rulemaking power to define what insider trading is.

Federal regulation of insider trading began with the passage of Section 16(b) of the '34 Act. 15 U.S.C. § 78p (1988). That provision regulates short-swing trading by insiders and requires that they disgorge any profits from such trading to the corporation. Until 1961, it constituted the sole federal regulation of insider trading. Section 16(b) regulates trading over a statutorily-defined six-month period without regard to the purpose of the trading or its basis in nonpublic information, id. § 78p(b) ("irrespective of any intention"), defines insider precisely as a holder of 10 percent of the corporation's shares ("directly or indirectly the beneficial owner of more than 10 per centum"), or as a director or an officer, id. § 78p(a), and provides a mechanical method of determining "profits" under which disgorgement is required even when the trades as a whole have resulted in losses, id. § 78p(b) ("any sale and purchase ... within any period of less than six months"); see Gratz v. Claughton, 187 F.2d 46, 50–52 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951). As a result, Section 16(b)'s enforcement by courts has led to no more, and perhaps fewer, problems of statutory interpretation than have resulted from any other provision of federal securities law.

The existence of Section 16(b), which indicates that Congress expressly addressed the issue, might well have led the SEC and the courts to conclude that Congress intended that Section 16(b) be the sole provision governing insider trading. No other provision explicitly addresses the problem, and Section 16(b) eliminates what is perhaps the most obvious danger inherent in insider trading, namely the creation of an incentive for directors or officers to make share price volatile in order to profit from short-swing trading.[2] Moreover, one might

---

**1.** Although the public appears to have a strongly negative view of insider trading, there are academics who believe it to be beneficial, see H. Manne, *Insider Trading and the Stock Market* (1966), and considerable diversity as to why insider trading should be regulated exists among its academic opponents, see, e.g., Kaplan, *Wolf v. Weinstein: Another Chapter on Insider Trading*, 1963 Sup.Ct.Rev. 273; Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 Harv.

L.Rev. 322 (1979); Easterbrook, *Insider Trading, Secret Agents, Evidentiary Privileges, and the Production of Information*, 1981 Sup.Ct.Rev. 309.

**2.** Some commentators have suggested that Section 16(b) is designed, or at least operates, to increase management's autonomy from shareholder control because it limits the freedom of owners of large blocs of stock to trade and thus deters institutional investors from acquiring

have inferred from Section 16(b)'s mechanical approach, ignoring purpose and actual profit, that regulation of insider trading without legislative or regulatory guidelines would involve a mare's nest of analytic and definitional problems.

Nevertheless, in 1961 the SEC held that insider trading might also violate Section 10(b) of the '34 Act. *See Cady, Roberts & Co.,* 40 SEC 907 (1961). Although Section 10(b) is familiar to any federal judge with a month of service, it is worth quoting its pertinent language:

It shall be unlawful for any person, directly or indirectly .

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe....

15 U.S.C. § 78j (1988). The regulation promulgated by the SEC pertinent to the instant case is Rule 10b–5. That rule reads:

It shall be unlawful for any person, directly or indirectly ...

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990).

Even the most fervent opponents of insider trading must concede that the language of Section 10(b) and Rule 10b–5 is at best a general authorization to the SEC and to the courts to fashion rules founded largely on those tribunals' judgments as to why insider trading is or is not fraudulent, deceptive or manipulative. That much was evident in *Cady, Roberts & Co.* itself, which was decided almost a generation after Section 10(b) had been passed and yet was without direct precedent. The grounds for the decision are also worth quoting in detail:

We have already noted that the antifraud provisions are phrased in terms of 'any person' and that a special obligation has been traditionally required of corporate insiders, e.g., officers, directors and controlling stockholders. These three groups, however, do not exhaust the classes of persons upon whom there is such an obligation. Analytically, the obligation rests on two principal elements; first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing.... Thus our task here is to identify those persons who are in a special relationship with a company and privy to its internal affairs, and thereby suffer correlative duties in trading in its securities. Intimacy demands restraint lest the uninformed be exploited.

\* \* \* \* \* \*

We cannot accept respondents' contention that an insider's responsibility is limited to existing stockholders and that he has no special duties when sales of securities are made to non-stockholders. This approach is too narrow. It ignores the plight of the buying public—wholly unprotected from the misuse of special information.

... Whatever distinctions may have existed at common law based on the view that an officer or director may stand in a fiduciary relationship to existing stock-

such blocs. Roe, *A Political Theory of American Corporate Finance,* 91 Colum.L.Rev. 10, 27 (1991).

holders from whom he purchases but not to members of the public to whom he sells, it is clearly not appropriate to introduce these into the broader anti-fraud concepts embodied in the securities acts.

Respondents further assert that they made no express representations and did not in any way manipulate the market, and urge that in a transaction on an exchange there is no further duty such as may be required in a 'face-to-face' transaction. We reject this suggestion. It would be anomalous indeed if the protection afforded by the antifraud provisions were withdrawn from transactions effected on exchanges, primary markets for securities transactions. If purchasers on an exchange had available material information known by a selling insider, we may assume that their investment judgment would be affected and their decision whether to buy might accordingly be modified. Consequently, any sales by the insider must await disclosure of the information.

(footnotes omitted). *Cady, Roberts & Co.* thus adopted a rule against insider trading with two elements: (i) a trader's relationship giving special access to corporate information not intended for private use and (ii) the unfairness resulting from trading with those who lack the informational advantage afforded by that special access. Under the theory of *Cady, Roberts & Co.*, the second element furnishes the fraud or deception that links the prohibition on insider trading to Section 10(b).

In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) ("*TGS*"), we adopted the dual element rule of *Cady, Roberts & Co.* We also noted, however, that *Cady, Roberts & Co.*—which involved a tippee who was a partner in a brokerage firm that employed a director, the tipper, of the corporation in question—had stated that Section 10(b)'s ban on insider trading applied to more than traditional insiders such as officers, directors and controlling stockholders. 401 F.2d at 848. We thus stated that "anyone in possession of material inside information must either disclose it to the investing pub-

lic, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." *Id.* We stressed that Congress wanted investors to "be subject to identical market risks." *Id.* at 852. Section 10(b)'s ban on insider trading was thus designed to eliminate "inequities based upon unequal access to knowledge." *Id.*

*TGS* thus emphasized the second element in *Cady, Roberts & Co.*, the perceived unfairness to those who trade with the insider. Although each trader in *TGS* probably had a relationship to the corporation with regard to the information in question sufficient to satisfy the first element of *Cady, Roberts & Co.*, *TGS* suggested that possession of material, nonpublic information, however acquired, was sufficient by itself to trigger an obligation to disclose or abstain from trading.

In a subsequent decision, *United States v. Chiarella*, 588 F.2d 1358 (2d Cir.1978), *rev'd*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), we affirmed the conviction of an employee of a printer who determined from coded takeover documents the identity of target corporations and thereafter purchased stock in those corporations. The basis for our decision tracked *TGS*, namely, the perceived unfairness of trading on information that is not generally available. We thus stated, "[*a* ]*nyone* — corporate insider or not—who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose. And if he cannot disclose, he must abstain from buying or selling." 588 F.2d at 1365 (emphasis in original, footnote omitted). In a footnote to the quoted passage, we noted that Chiarella was legally disabled from disclosing because he owed a duty to his employer not to reveal confidential information belonging to the employer's clients. *Id.* at 1365 n. 9. *Chiarella* thus extended the ban on insider trading to "*anyone*," limited only by the phrase "regularly receives," and relegated the role of *Cady, Roberts & Co.*'s first element—a

relationship to the firm giving access to confidential corporate information—to eliminating the option of disclosure (and thus trading) by insiders.

Our rationale seemed overbroad to many, including the Solicitor General, whose task it was to defend the judgment we had affirmed. The brief filed in the Supreme Court on behalf of the government thus downplayed the fact that Chiarella had traded on information unavailable to others and instead relied upon the first reason given in *Cady, Roberts & Co.*, namely, that Chiarella's trading was based on information that belonged to his employer's clients. *See* Brief for Government at 70–71 n. 48, *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); Easterbrook, *supra*, at 314–15.

The Supreme Court reversed *Chiarella.* However, rather than making an *ab initio* determination of whether Section 10(b) prohibited insider trading, the Court described the state of the caselaw in the SEC and lower federal courts, including *Cady, Roberts & Co.* and *TGS*, and impliedly adopted that caselaw. 445 U.S. at 225–30, 100 S.Ct. at 1113–16. Notwithstanding its seeming adoption of that caselaw, the Court's opinion rejected the view that any trading on material nonpublic information triggered a duty to disclose. *Id.* at 231–35, 100 S.Ct. at 1116–18. It reasoned that fraud must be shown under Section 10(b) and that silence cannot constitute a fraud absent a duty to speak owed to those who are injured. *Id.* at 232–33, 100 S.Ct. at 1116–17. Because Chiarella had no prior dealings with those from whom he bought the stock, was not their agent, fiduciary or someone in whom they placed trust—as is true of all buyers and sellers trading on impersonal exchanges—Chiarella owed those from whom he purchased stock no duty to disclose before trading. *Id.* The Court declined to decide whether his conviction might be affirmed on the theory advanced by the Solicitor General that he had breached a duty to his employer's clients, the acquiring corporations, because the instructions to the jury did not include that theory. *Id.* at 235–36, 100 S.Ct. at 1118–19.

Although *Chiarella's* description of prior caselaw appeared to adopt *Cady, Roberts & Co.* and *TGS*, it cannot be reconciled with those decisions. By explicitly holding that Chiarella's access to material nonpublic information did not create a duty on Chiarella's part to those from whom he purchased stock of the target corporations, *Chiarella* is inconsistent with *Cady, Roberts & Co.*, which explicitly found a duty to those with whom the trader dealt even when the trade was made on an impersonal exchange. 40 S.E.C. at 912–13. Moreover, *Chiarella* stated that even if the informational edge insiders have over those with whom they trade is unfair, that advantage was not fraud under Section 10(b). 445 U.S. at 232, 100 S.Ct. at 1116–17.

The *Chiarella* opinion is thus an enigma. It appears to state that Section 10(b) bars some kinds of insider trading. However, it rejects the element of *Cady, Roberts & Co.* that provided the fraud or deception linking the conduct to the provisions of Section 10(b).

Matters were clarified a tad in *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Dirks had learned from employees of Equity Funding that the corporation had systematically and fraudulently overstated its assets. *Id.* at 649, 103 S.Ct. at 3258–59. Dirks informed his clients and the *Wall Street Journal* as well. His clients, who could sell their Equity Funding shares without risking a libel action, acted on Dirks' information while the *Journal* did not. *Id.* at 649–50, 103 S.Ct. at 3258–59. The SEC commenced a proceeding against Dirks on the ground that he had illegally aided and abetted insider trading by informing his clients of the material nonpublic information that Equity Funding was a fraud. The Supreme Court disagreed.

In the Court's view, a tippee such as Dirks may be liable under Section 10(b) if the tipper breaches a fiduciary obligation by transmitting the material nonpublic information to the tippee. *Id.* at 661–64, 103 S.Ct. at 3265–66. Whether the tip breaches such a fiduciary obligation depends upon

whether the tipper "receives a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings." *Id.* at 663, 103 S.Ct. at 3266. "The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of profits to the recipient." *Id.* at 664, 103 S.Ct. at 3266.

However, the Court concluded that Dirks owed no duty to Equity Funding, its shareholders, or, under *Chiarella,* to those who purchased stock from his clients. *Id.* at 665, 103 S.Ct. at 3267. Moreover, it also held that the employees of Equity Funding who had provided information to Dirks breached no duty to Equity Funding or its shareholders. *Id.* at 666, 103 S.Ct. at 3267. The Court noted that the employees neither had received a benefit from their disclosure to Dirks nor had intended to make a gift of such information to Dirks. *Id.* at 667, 103 S.Ct. at 3268. Instead, they were motivated soley by a desire to expose fraud. *Id.* It also noted that their action prevented the fraud from continuing and injuring yet new victims. *Id.* at 666, n. 27, 103 S.Ct. at 3267, n. 27.

Apart from the 4–4 vote in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), regarding the so-called misappropriation theory, Supreme Court caselaw regarding insider trading under Section 10(b) stops with *Dirks.* Omitted from the Court's opinions is a statement of the reasons why Section 10(b) prohibits the kind of trading the Court has declared to be illegal. Having rejected the *Cady, Roberts & Co.* theory of fraud or deception in the superiority of information available to the inside trader and a resultant duty in the trader to the persons with whom trading occurs, the Court's decisions have severed the link to Section 10(b) perceived in prior caselaw. While *Dirks* has established a rule concerning the insider's breach of an obligation to the corporation whose shares are traded, the Court's rationale is obscure, and, as a result, so is the scope of the rule.

Notwithstanding the ambiguities surrounding Section 10(b)'s impact on insider trading—including its very definition—Congress has increased the penalties for violations of that prohibition. *See* Insider Trading Sanctions Act of 1984, Pub.L. No. 98–376, 98 Stat. 1264. The SEC in turn has failed to promulgate rules outside the area of tender offers but its decisions have continued to march, in the eyes of one commentator, to the beat of its own drummer. *See* Coffee, *supra,* at 5., col. 1 ("in *Stevens* ... the SEC has announced a theory that trivializes *Dirks* ").

It is hardly surprising that disagreement exists within an *in banc* court of appeals as to the import of present caselaw. Nor is it surprising that the lower courts have added to the *Dirks* breach of duty doctrine a misappropriation of information doctrine, which prohibits trading in securities based on material, nonpublic information acquired in violation of a duty to any owner of such information, whether or not the owner is the corporation whose shares are traded. *See SEC v. Materia,* 745 F.2d 197, 203 (2d Cir.1984) ("one who misappropriates [material] nonpublic information in breach of a fiduciary duty and trades on that information" violates Section 10(b) and Rule 10b–5); *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *accord SEC v. Cherif,* 933 F.2d 403, 408–10 (7th Cir.1991); *SEC v. Clark,* 915 F.2d 439, 443–49 (9th Cir.1990); *Rothberg v. Rosenbloom,* 771 F.2d 818, 822 (3d Cir.1985).

### b) Property Rights in Inside Information

One commentator has attempted to explain the Supreme Court decisions in terms of the business-property rationale for banning insider trading mentioned in *Cady, Roberts & Co. See* Easterbrook, *supra,* at 309–39. That rationale may be summarized as follows. Information is perhaps the most precious commodity in commercial markets. It is expensive to produce, and, because it involves facts and ideas that can be easily photocopied or carried in one's head, there is a ubiquitous risk that those

who pay to produce information will see others reap the profit from it. Where the profit from an activity is likely to be diverted, investment in that activity will decline. If the law fails to protect property rights in commercial information, therefore, less will be invested in generating such information. *Id.* at 313.

For example, mining companies whose investments in geological surveys have revealed valuable deposits do not want word of the strike to get out until they have secured rights to the land.[3] If word does get out, the price of the land not only will go up, but other mining companies may also secure the rights. In either case, the mining company that invested in geological surveys (including the inevitably sizeable number of unsuccessful drillings) will see profits from that investment enjoyed by others. If mining companies are unable to keep the results of such surveys confidential, less will be invested in them.

Similarly, firms that invest money in generating information about other companies with a view to some form of combination will maintain secrecy about their efforts, and if secrecy cannot be maintained, less will be invested in acquiring such information. Hostile acquirers will want to keep such information secret lest the target mount defensive actions or speculators purchase the target's stock. Even when friendly negotiations with the other company are undertaken, the acquirer will often require the target corporation to maintain secrecy about negotiations, lest the very fact of negotiation tip off others on the important fact that the two firms think a combination might be valuable. *See, e.g., Staffin v. Greenberg,* 672 F.2d 1196, 1207 n. 12 (3d Cir.1982) ("If, as is often the case, a merger will benefit both the acquired company and its shareholders, an insider

may be obliged to maintain strict confidentiality to avoid ruining the corporate opportunity through premature disclosure. Indeed, the record is clear in this case that [the buyer] very nearly withdrew from merger discussions upon hearing of [the seller's] ... press release."); *Flamm v. Eberstadt,* 814 F.2d 1169, 1174–79 (7th Cir.) ("[P]otential acquirers ... may fear that premature disclosure may spark competition that will deprive them of part of the value of their effort, so that bids in a world of early disclosure will be lower than bids in a world of deferred disclosure."), *cert. denied,* 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987). In the instant matter, A & P made secrecy a condition of its acquisition of Waldbaum's.

Insider trading may reduce the return on information in two ways. First, it creates incentives for insiders to generate or disclose information that may disregard the welfare of the corporation. Easterbrook, *supra,* at 332–33. That risk is not implicated by the facts in the present case, and no further discussion is presently required.

Second, insider trading creates a risk that information will be prematurely disclosed by such trading, and the corporation will lose part or all of its property in that information. *Id.* at 331. Although trades by an insider may rarely affect market price, others who know of the insider's trading may notice that a trader is unusually successful, or simply perceive unusual activity in a stock and guess the information and/or make piggyback trades.[4] *Id.* at 336. A broker who executes a trade for a geologist or for a financial printer may well draw relevant conclusions. Or, as in the instant matter, the trader, Loeb, may tell his or her broker about the inside information, who may then trade on his or her account, on clients' accounts, or may tell

---

**3.** Although *TGS* stressed the unfairness of insider trading to those who deal with the trader, the reason for the nondisclosure that allowed insider trading in TGS stock was the company's insider trading in real estate.

**4.** Section 16(a) of the '34 Act requires insiders to report trades in a corporation's stock (i) at the time of a new issue, (ii) when they become an insider, and (iii) each month thereafter in which

trades occur. Where insiders are able to avoid "profits" as defined in Section 16(b) and trade heavily—e.g., a series of purchases that cannot be matched with sales during the six months at either end of the activity—other traders may well draw accurate inferences. In that respect, federal law causes the information on which insiders are trading to become known.

friends and relatives. One inside trader has publicly attributed his exposure in part to the fact that the bank through which he made trades piggybacked on the trades, as did the broker who made the trades for the bank. *See* Levine, *The Inside Story of An Inside Trader*, Fortune, May 21, 1990, at 80. Once activity in a stock reaches an unusual stage, others may guess the reason for the trading—the corporate secret. Insider trading thus increases the risk that confidential information acquired at a cost may be disclosed. If so, the owner of the information may lose its investment.

This analysis provides a policy rationale for prohibiting insider trading when the property rights of a corporation in information are violated by traders. However, the rationale stops well short of prohibiting all trading on material nonpublic information. Efficient capital markets depend on the protection of property rights in information. However, they also require that persons who acquire and act on information about companies be able to profit from the information they generate so long as the method by which the information is acquired does not amount to a form of theft. A rule commanding equal access would result in a securities market governed by relative degrees of ignorance because the profit motive for independently generating information about companies would be substantially diminished. Easterbrook, *supra*, at 313–14. Under such circumstances, the pricing of securities would be less accurate than in circumstances in which the production of information is encouraged by legal protection.

One may speculate that it was for these reasons that the Supreme Court declined in *Chiarella* to adopt a broad ban on trading on material nonpublic information [5] and

then imposed in *Dirks* a breach of fiduciary duty requirement—not running to those with whom the trader buys or sells. Under the *Dirks* rule, insider trading is illegal only where the trader has received the information as a result of the trader's or tipper's breach of a duty to keep information confidential.

The misappropriation theory adopted by several circuits fits within this rationale. Misappropriation also involves the misuse of confidential information in a way that risks making information public in a fashion similar to trading by corporate insiders. In *U.S. v. Carpenter*, 791 F.2d 1024 (2d Cir.1986), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), for example, where the information belonged to the *Wall Street Journal* rather than to the corporations whose shares were traded, the misuse of information created an incentive on the part of the traders to create false information that might affect the efficiency of the market's pricing of the corporations' stock. Moreover, the potential for piggybacking would add to that inefficiency.

It must be noted, however, that, although the rationale set out above provides a policy for prohibiting a specific kind of insider trading, any obvious relationship to Section 10(b) is presently missing because theft rather than fraud or deceit, seems the gravamen of the prohibition. Indeed, *Carpenter* analogized the conduct there to embezzlement. 791 F.2d at 1033 n. 11. Nevertheless, the law is far enough down this road—indeed, the Insider Trading Sanctions Act seems premised on Section 10(b)'s applicability—that a court of appeals has no option but to continue the route.

---

5. Comprehensive protection of those who trade with insiders is unattainable because the most common form of insider trading by far is failing to trade. An insider possessing nonpublic information may purchase or sell other securities or borrow instead of trading in the corporation's stock. Such trading seems virtually undiscoverable and unregulable, however, although it is functionally indistinguishable from insider trading so far as those who deal with the trader are concerned.

Under the business property rationale, not-trading because of inside information is not the functional equivalent of trading because not-trading creates at most a negligible risk of disclosure of corporate secrets. Unlike trading, not-trading does not involve persons other than the trader, such as brokers, and does not create an unusual volume. *But see* Easterbrook, *supra*, at 336–37 (discussing signals sent to such parties by *not* trading).

## c) The Instant Case

When this analysis is applied to a family-controlled corporation such as that involved in the instant case, I believe that family members who have benefitted from the family's control of the corporation are under a duty not to disclose confidential corporate information that comes to them in the ordinary course of family affairs. In the case of family-controlled corporations, family and business affairs are necessarily intertwined, and it is inevitable that from time to time normal familial interactions will lead to the revelation of confidential corporate matters to various family members. Indeed, the very nature of familial relationships may cause the disclosure of corporate matters to avoid misunderstandings among family members or suggestions that a family member is unworthy of trust.

Keith Loeb learned of the pending acquisition of Waldbaum's by A & P through precisely such interactions. His wife Susan was asked one day by her sister to take carpool responsibilities for their children. When Susan inquired as to why this was necessary, the sister was vague and said that she had to take their mother somewhere. After further inquiry, the sister flatly declined to tell Susan what was going on. Susan did not say, "Gee, confidential corporate information must be involved, and I have no right to such information." Instead, concerned about her mother's ongoing health problems, Susan made direct inquiry of her mother, who revealed that Susan's sister took her to get stock certificates to give to Ira Waldbaum for the initial phase of the A & P acquisition. The mother swore Susan to secrecy, telling Susan that the acquisition would be very profitable to the family and premature disclosure could ruin the deal. Susan then asked whether she could tell her husband Keith. Instead of saying, "No, Keith may be your husband but you are to button your lips in his presence," her mother assented but warned against disclosure to anyone else.

Susan and Keith Loeb jointly owned a large number of Waldbaum shares at that time, all of which had been a gift from her mother. The Loebs' children also owned shares received as a gift from their grandmother. Susan told Keith about the A & P acquisition in the course of discussing the financial benefits they and their children would receive as a result of that transaction. She stressed the need for absolute secrecy. Susan testified that she and her husband had shared confidences in the past and that on each such occasion they had indicated to each other that the confidences would be respected. Thereafter, Keith Loeb informed Chestman about the A & P acquisition in the hope of making a profit.

I have little difficulty in concluding that Chestman's convictions can be affirmed on either the *Dirks* rule or on a misappropriation theory. The disclosure of information concerning the A & P acquisition among Ira Waldbaum's extended family was the result of ordinary familial interactions that can be expected in the case of family-controlled corporations. Members of a family who receive such information are placed in a position in which their trading on the information risks financial injury to the corporation, its public shareholders and other family members. When members of a family have benefitted from the family's control of a corporation and are in a position to acquire such information in the ordinary course of family interactions, that position carries with it a duty not to disclose. The family relationship gives such members access to confidential information, not so that they can trade on it but so that informal family relationships can be maintained. The purpose of allowing this access can hardly be fulfilled if there is no accompanying duty not to trade. Such a duty is of course based on mutual understandings among family members—quite explicit in this case—and owed to the family. However, the duty originates in the corporation and is ultimately intended to protect the corporation and its public shareholders. The duty is thus also owed to the corporation, to a degree sufficient in my view to trigger the *Dirks* rule. Because trading on inside information so acquired by family members amounts to theft, the misappropriation theory also applies.

Under my colleagues' theory, the disclosure of family corporate information can be avoided only by family members extracting formal, express promises of confidentiality or by elderly mothers in poor health refusing to tell their daughters about mysterious travels. If disclosure is made, daughters may not disclose their mother's doings or potential financial benefits to the daughters' husbands without a formal, express promise of confidentiality. If, for example, Susan had earlier shared with Keith her concerns about her mother's mysterious travels before learning of their purpose, she would not have been able to tell him what she later learned about those travels no matter how persistently he asked. For my colleagues in the majority, the critical gap in the government's case was that Susan did not testify either that on this occasion Keith agreed not to disclose the pending acquisition by A & P or that prior confidential communications between her and her husband had involved the Waldbaum's corporation.

I have no lack of sympathy with my colleagues' concern about the difficulty of drawing lines in this area. Nevertheless, the line they draw seems very unrealistic in that it expects family members to behave like strangers toward each other. It also leads to the perverse and circular result that where family business interests are concerned, family members must act as if there are no mutual obligations of trust and confidence because the law does not recognize such obligations. Under such a regime, parents and children must conceal their comings and goings, family members must cease to speak when a son-in-law enters a room, and offended members of the family must understand that such conduct is always related only to business.

The law may have been reluctant to recognize obligations based solely on family relationships. However, the failure to recognize these commonly observed obligations as legal obligations is in large part derived from a concern that intra-family litigation would exacerbate strained relationships and weaken rather than strengthen the sense of mutual obligation underlying family relationships. *See, e.g., Kilgrow v. Kilgrow,* 268 Ala. 475, 107 So.2d 885 (1958) (judicial intervention in family affairs more likely to serve as "spark to a smoldering fire" than to prevent disruption); *McGuire v. McGuire,* 157 Neb. 226, 59 N.W.2d 336 (1953) (no action for maintenance and support where married couple living together).

This concern, however, is of no weight where insider trading is concerned. In such cases, the litigation is almost universally brought by the government or third party. Moreover, where the family connection to the corporation has benefitted the trader, the relationship is commercial as well as familial, and disclosure is potentially injurious to the corporation and public shareholders as well as other members of the family.

I thus believe that a family member (i) who has received or expects (e.g., through inheritance) benefits from family control of a corporation, here gifts of stock, (ii) who is in a position to learn confidential corporate information through ordinary family interactions, and (iii) who knows that under the circumstances both the corporation and the family desire confidentiality, has a duty not to use information so obtained for personal profit where the use risks disclosure. The receipt or expectation of benefits increases the interest of such family members in corporate affairs and thus increases the chance that they will learn confidential information. Disclosure in the present case occurred in the course of a discussion that included, *inter alia,* an examination of the benefits of the A & P acquisition to Susan, Keith and their children. Susan's warning to Keith about secrecy was clearly intended to protect the corporation as well as the family and clearly had originated with Ira Waldbaum. In such circumstances, Susan's saying "Don't tell" is enough for me. Not to have such a rule means that a family-controlled corporation with public shareholders is subject to greater risk of disclosure of confidential information than is a corporation that is entirely publicly owned.

I see no room for argument over whether there was sufficient evidence for the

jury to find that Chestman knew Keith Loeb was violating an obligation. The record fairly brims with Chestman's consciousness that Keith Loeb was behaving improperly. Loeb's initial message asked for a return call "asap." When they spoke, Loeb told Chestman that he, Loeb, had some "definite, some accurate information" that Waldbaum's was about to be sold at a price substantially greater than that at which it was trading. Chestman had been a broker for fourteen years, and the jury would have little trouble finding that he knew that, if word of the A & P acquisition had not already gotten out, profiting from purchases of Waldbaum's stock was as close to a sure thing as there can be in the securities market. Instead of telling Loeb to buy, however, Chestman said that he could not tell him what to do "in a situation like this" and told Loeb to make up his own mind. Clearly, Chestman's and Loeb's concerns were not about the commercial wisdom, but rather about the propriety, of Loeb's trading on the "definite" and "accurate" information. Indeed, Loeb did not give Chestman an order to buy Waldbaum's shares, and their conversation ended on an inconclusive note.

The only explanation for Chestman's and Loeb's failing to agree upon the entirely obvious course of buying Waldbaum's stock was their consciousness that Loeb's trading would be improper. This conclusion is strengthened by Chestman's conduct thereafter. Having failed to advise Loeb to buy, Chestman sought information as to whether there was unusual activity in Waldbaum's stock, and, learning there was not, bought Waldbaum's stock for his and his clients' accounts, including Loeb's. Chestman's attempt at concealment when he recorded the purchases for all of his clients but Loeb further showed Chestman's knowledge that Loeb was acting improperly. The evidence was thus more than sufficient to show Chestman's knowledge that Loeb was breaching an obligation of non-disclosure.

## 2) RULE 14e–3

I have little difficulty in concurring in the affirmance of Chestman's conviction for violating Section 14(e) and Rule 14e–3. Although the rule lacks a specific reference to a duty not to disclose, the sources of information specified in that rule—"(1) The offering person, (2) The issuer ... or (3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer"—all have such a duty under state law not to disclose nonpublic information concerning tender offers. Information relating to tender offers is always either notoriously public or a carefully guarded secret. The sources of information designated by the rule are necessarily under an obligation by reason of their very position not to disclose such nonpublic information. One who receives such information knowing the source can be held to know of a breach of duty. The rule is thus in the nature of a traditional prophylactic rule. Although the use of the word "indirectly" may lend itself to some extension down the line of tippees and tippers, it is sufficiently cabined to circumstances in which the defendant knows of the source. Chestman easily fits that definition.

## 3) MAIL FRAUD

With regard to appellant's convictions for mail fraud, my view that they should be affirmed follows from my discussion of the conviction for violations of Sections 10(b) and Rule 10b–5.

I would add a brief observation, however. I am unclear as to whether the breach of duty and the tippee's knowledge of that breach as required by *Dirks* is coextensive with the similar requirements in *Carpenter*. The *Dirks* rule is derived from securities law, and its limitation to information obtained through a breach of a fiduciary duty is, as noted, influenced by the need to allow persons to profit from generating information about firms so that the pricing of securities is efficient. The *Carpenter* rule, however, is derived from the law of theft or embezzlement, and a tippee's liability may be governed by rules concerning the possession of stolen property. Logic is therefore certainly not a barrier to the growth of disparate rules concerning a tippee's liability depending on wheth-

er Section 10(b) or mail fraud is the source of law. However, because under any such disparity in rules the Section 10(b) charge would be harder to prove than a mail fraud charge, I need not explore the issue further.

MINER, Circuit Judge, concurring:

I concur in the comprehensive opinion of Judge Meskill, which I take to be wholly in accordance with the views I expressed in the original panel opinion as to all the issues before us. *See United States v. Chestman*, 903 F.2d 75 (2d Cir.1990). I write only to comment upon the "familial relationship" rule of insider trading proposed by Judge Winter in his partially dissenting opinion.

The rule urged upon us would impose a duty of nondisclosure upon "a family member (i) who has received or expects (e.g., through inheritance) benefits from family control of a corporation, here gifts of stock, (ii) who is in a position to learn confidential corporate information through ordinary family interactions, and (iii) who knows that under the circumstances both the corporation and the family desire confidentiality." At 580. The duty is said to consist of an obligation "not to use information so obtained for personal profit where the use risks disclosure." *Id.*

The rationale for the proposed rule apparently is rooted in the notion that family members would be encouraged to speak freely on all matters pertaining to the family, knowing that the lips of those who receive confidential corporate information in the course of ongoing family interchanges would be sealed. Thus, in this case, so the argument goes, Ira Waldbaum could reveal the pending stock sale to his sister, Shirley Witkin, who could reveal it to her daughter, Susan Loeb, who could reveal it to her husband, Keith Loeb, all with the understanding that a duty imposed by law on each family member would protect against use of the confidential information for profit. Without the rule, it is maintained, family members in this case would have been inhibited from discussing such matters as the reason for Shirley Witkin's unusual absence from her home, because such a discussion inevitably would lead to disclosure of the confidential information regarding the sale of Waldbaum stock to A & P.

It seems to me, however, that family discourse would be inhibited, rather than promoted, by a rule that would automatically assure confidentiality on the part of a family member receiving non-public corporate information. What speaker, secure in the knowledge that a relative could be prosecuted for insider trading, would reveal to that relative anything remotely connected with corporate dealings? Given the uncertainties surrounding the definition of insider trading, a term as yet unclarified by Congress, what family members would want to receive any information whatsoever that might bear on the family business? How could family news be disseminated freely in an atmosphere where the members must be ultra-sensitive to whether "both the corporation and the family" are seeking some measure of confidentiality "under the circumstances."

The difficulty of identifying those who would be covered by the proposed familial rule adds an additional element of uncertainty to what already are uncertain crimes. It is not clear just who would be subject to the duty of confidentiality: family members "who ha[ve] received or expect[ ] ... benefits from family control of a corporation" belong to a very broad category indeed. Here, those who have received gifts of stock are included. But does the category include those who have received only small amounts of stock? Does it matter what proportion the stock bears to the total issued and outstanding shares? Does the category include one who expects to receive stock through inheritance but never receives any? Does it include grandchildren who expect ultimately to inherit assets purchased with the proceeds of the sale of the family-controlled corporation? The net would be spread wider than appropriate in a criminal context. *Cf. Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S.Ct. 900, 905, 84 L.Ed. 1213 (1940) ("Here we have a situation analogous to a conviction under a statute sweeping in a great variety

of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application").

In the same vein, it is conceivable that minor children could find themselves "in a position to learn confidential corporate information through ordinary family interactions." If they came into the possession of such information and somehow acquired the knowledge "that under the circumstances both the corporation and the family desire[d] confidentiality," would they become tippers who would expose other family members to criminal liability as tippees when they passed the information along?

It is important to note that in the case at bar we deal with an attenuated trail of family confidences in which information was received without any assurance of confidentiality by the receiver and without any prior sharing of business information within the family. Neither Shirley Witkin nor her daughter nor her son-in-law were involved in any way in the operation of the Waldbaum business or privy to any of its past secrets. Family relationships being what they are, it makes little sense under the circumstances to imply assurances that confidentiality would be maintained. Of course, a different situation obtains where the giver of business confidences, in addition to having a family relationship with the receiver, also has a history of reposing such confidences in the receiver. *See United States v. Reed*, 601 F.Supp. 685, 712, 717 (S.D.N.Y.), *rev'd on other grounds*, 773 F.2d 477 (2d Cir.1985) (son of corporate director as receiver of non-public corporate information). Under those circumstances, the duty of confidentiality is implied from the business relationship coupled with the family one.

Finally, to further extend the concept of confidential duty would be to take the courts into an area of securities regulation not yet entered by Congress. It would give the wrong signal to prosecutors in their continuing efforts to push against existing boundaries in the prosecution of securities fraud cases. "[P]rosecutors can often claim that some confidential relationship was abused—whether between lovers, family members, longtime friends, or simply that well-known confidential relationship between bartender and drunk. Such a test inherently creates legal uncertainty and invites selective prosecutions." Coffee, *Outsider Trading, That New Crime*, Wall St.J., Nov. 14, 1990, at 16, col. 4. I would await further instructions from Congress before sailing into this unchartered area.

MAHONEY, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Meskill's opinion for the majority except as to its ruling that the SEC did not exceed its rulemaking authority when it promulgated rule 14e–3(a), from which I respectfully dissent. Accordingly, I am also in disagreement with the brief discussion of this issue in Judge Winter's separate opinion, which concurs in Judge Meskill's resolution of the question.

The majority concludes that: "based on the plain language of section 14(e), and congressional activity both before section 14(e) was enacted and after Rule 14–3(a) was promulgated, we hold that the SEC did not exceed its statutory authority in drafting Rule 14e–3(a)," adding that neither *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), nor *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), poses any barrier to this ruling. I will therefore address: (1) the pertinent language of section 14(e), (2) its pre- and post-enactment legislative history, and (3) the impact of *Chiarella* and *Schreiber* upon this issue.

As the majority notes, rule 14e–3 "creates a duty in those traders who fall within its ambit to abstain or disclose, without regard to whether the trader owes a preexisting fiduciary duty to respect the confidentiality of the information." The question presented is whether, in doing so, rule 14e–3(a) properly derives from the second sentence of section 14(e), which states: "The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably de-

signed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

The majority opinion swiftly collapses this language into an authorization for the SEC to "define fraud." If this is a legitimate construction of the statutory language, of course, the issue is decided and does not warrant extended discussion. It is clear, however, that the statute says something significantly different.

The second sentence of section 14(e) authorizes the SEC to define, and prescribe preventive measures for, "such acts and practices as are fraudulent, deceptive, or manipulative." This statutory mandate became law in 1970, two years after the Williams Act was originally enacted and in the early years of the tender offer phenomenon and its attendant regulation.

Especially in view of this context, the plain meaning of the dispositive language is that the SEC is empowered to identify and regulate, in this (then) novel context, the "acts and practices" that fit within the existing legal categories of the "fraudulent, deceptive, or manipulative," but not to redefine the categories themselves. Furthermore, these venerable terms are used in section 14(e) in their normal, accepted legal definitions. The Supreme Court has made clear that in adding the 1970 amendment, Congress did not "suggest[ ] any change in the meaning of the term 'manipulative' itself." *Schreiber,* 472 U.S. at 11 n. 11, 105 S.Ct. at 2464 n. 11. There is no reason to reach a different conclusion as to the term "fraudulent." Finally, the focus upon novel and emerging "acts and practices" rebuts the majority's view that unless the 1970 amendment is deemed to authorize the SEC to engage in creative redefinitions of the terms "fraudulent, deceptive or manipulative," the amendment will become a meaningless repetition of the preexisting self-operative provisions of section 14(e).

In the majority's view, moreover, even the meaning of the term "fraudulent" as used in the second sentence of section 14(e) is irrelevant. Because the statute empowers the SEC to "prescribe means reasonably designed to prevent ... such acts and practices as are fraudulent," the majority concludes that the statutory authorization "necessarily encompasses the power to proscribe conduct outside the purview of fraud, be it common law or SEC-defined fraud."

This is a truly breathtaking construction of a delegation to the SEC, we must bear in mind, of the authority to prescribe a federal felony. *See* 15 U.S.C. § 78ff(a) (1988) (defining any willful violation of the Securities Exchange Act of 1934, "or any rule or regulation thereunder," as a felony subject to ten years imprisonment and a $1,000,000 fine); *Touby v. United States,* —— U.S. ——, 111 S.Ct. 1752, 1756, 114 L.Ed.2d 219 (1991) (reserving for future consideration question whether enhanced guidance must be provided "when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions"). In any event, the majority's gloss on the statutory language is transparently implausible. While the SEC was authorized to utilize flexible regulatory means in this emerging area, those means had to be directed at "such acts and practices as are fraudulent" within the meaning of the statute. It is thus clearly unacceptable to conclude that Chestman can be validly convicted of a felony violation of section 14(e) and rule 14e–3(a) for, in the words of the majority, "conduct outside the purview of fraud, be it common law or SEC-defined fraud."

The legislative history of the 1970 amendment similarly lends little support to the majority's position. Aside from some amiable generalities by Senator Williams, the majority points only to a memorandum by the SEC Division of Corporation Finance that, in response to an inquiry by Senator Williams, listed the following as one of the seven "problem areas which may be dealt with by [the] rule-making authority" provided by the 1970 amendment to section 14(e): "5. The person who has become aware that a tender bid is to be made, or has reason to believe that such bid will be made, may fail to disclose material facts with respect thereto to persons who sell to him securities for which the tender bid is to be made." *Additional Consumer Protec-*

*tion in Corporate Takeovers and Increasing the Securities Act Exemptions for Small Businessmen*, Hearings on S. 336 and S. 3431 before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong., 2d Sess. 12 (1970).

It is plainly inappropriate to suggest that this rough outline of a regulatory "problem area" should be read to provide a precise delineation of the scope and purpose of the 1970 amendment. I note, for example, that this scenario does not suggest the source of the hypothetical buyer's knowledge, or "reason to believe," that a tender offer is imminent. Are we therefore to conclude that the derivation of the information is irrelevant? For example, would the buyer be guilty of a federal felony if his information as to the likelihood of a tender offer was derived from his observation of heavy trading in the target company's stock, without any direct or indirect input from the target company or the offeror? I am not aware of any responsible authority that reads the 1970 amendment of section 14(e) as authorizing so sweeping a revision of federal securities law, and the SEC made no such assertion in promulgating rule 14e–3(a), but such a purchaser would clearly fall within the "problem area" outlined in the SEC memorandum. Similarly, I suggest, this thumbnail sketch of a "problem area" should not be accorded significance in determining whether the 1970 amendment empowered the SEC to disregard existing legal concepts of fraud in devising regulations addressed to the definition and prevention of "such acts and practices as are fraudulent."

The post-enactment history is even less supportive of the majority's position. The majority points to legislative reports accompanying Congress' enactment of the Insider Trading Sanctions Act of 1984 and the Insider Trading and Securities Fraud Enforcement Act of 1988 as somehow indicating Congressional support of the SEC's 1980 departure from prior law in promulgating rule 14e–3(a). As I stated in my concurring opinion during the panel consideration of this appeal, in addressing the identical legislative history:

[T]he very casual references to rule 14e–3 in H.R.Rep. No. 910, 100th Cong., 2d Sess. 14 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 6043, 6051, and H.R.Rep. No. 355, 98th Cong., 1st Sess. 13 n. 20 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2286 n. 20, provide no basis for concluding that later statutory enactments have recognized not only the promulgation and existence of rule 14e–3, but also the Commission's claim that rule 14e–3 effects an implied repeal of any fiduciary duty requirement in the area of tender offer fraud.

In particular, H.R.Rep. No. 98–355 explicitly states that the legislation on which it reports, the Insider Trading Sanctions Act of 1984, "does not change the underlying substantive case law of insider trading as reflected in judicial and administrative holdings." *Id.* at 13. Similarly, H.R. No. 100–910 makes clear that the Insider Trading and Securities Fraud Enforcement Act of 1988 does not address the substantive law of insider trading. *Id.* at 7.

*United States v. Chestman*, 903 F.2d 75, 86 (2d Cir.1990) (MAHONEY, J., concurring in part and dissenting in part).

The cases cited by the majority on this issue are easily distinguished. In *United States v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979), the committee reports accompanying amendatory legislation subsequent to the agency ruling at issue explicitly approved the challenged agency position. *See id.* at 553, 99 S.Ct. at 2475–76. In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), Congress had adopted explicit statutory language that "vindicated" the agency position on the issue in litigation. *See id.* at 380, 89 S.Ct. at 1801. *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965), noted that *"[u]nder some circumstances,"* Congressional silence in the face of an administrative position has been deemed acquiescent in that position, but stated that "[i]n this case … the inference is supported by more than *mere congressional inaction." Id.* at 11, 85 S.Ct. at 1278 (emphasis added).

As indicated above, the circumstances presented here provide no support for a finding of Congressional acquiescence in the novel legal theory embodied in rule 14e–3(a). Congress' subsequent consideration of enhanced penalties for insider trading violations, explicitly eschewing any intention to address the pertinent issues of substantive law, does nothing to validate rule 14e–3. Furthermore, the majority opinion surprisingly disregards the most germane Supreme Court authority on this issue. In *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Court rejected a similar argument for Congressional ratification of an SEC position, stating:

> The Commission finds further support for its interpretation of § 10(b) as not requiring proof of scienter in injunctive proceedings in the fact that *Congress was expressly informed of the Commission's interpretation on two occasions when significant amendments to the securities laws were enacted*—The Securities Act Amendments of 1975, Pub.L. 94–29, 89 Stat. 97, and the Foreign Corrupt Practices Act of 1977, Pub.L. 95–213, 91 Stat. 1494—and on each occasion Congress left the administrative interpretation undisturbed. See S.Rep. No. 94–75, p. 76 (1975), U.S.Code Cong. & Admin.News 1975, p. 179; H.R.Rep. No. 95–640, p. 10 (1977). But, since the legislative consideration of those statutes was addressed principally to matters other than that at issue here, it is our view that the *failure of Congress to overturn the Commission's interpretation falls far short* of providing a basis to support a construction of § 10(b) so clearly at odds with its plain meaning and legislative history. See *SEC v. Sloan*, 436 U.S. 103, 119–121, 98 S.Ct. 1702, 1712–1713, 56 L.Ed.2d 148 [1978].

*Id.* at 694 n. 11, 100 S.Ct. at 1954 n. 11 (emphasis added). In *Sloan*, the Court rejected the SEC's interpretation of a statute despite subsequent reenactment of that statute coupled with an endorsement of the SEC's view in a committee report addressing the issue. *See* 436 U.S. at 119–20 & n. 10, 98 S.Ct. at 1712–13 & n. 10. *A fortiori*, no ratification has occurred as to rule 14e–3(a).

Rule 14e–3(a) was enacted in the immediate aftermath of the Supreme Court's ruling in *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Addressing section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1988), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1991), the Court ruled in *Chiarella* that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." 445 U.S. at 235, 100 S.Ct. at 1118. If that rule applies in the area of tender offers and section 14(e), of course, rule 14e–3(a) is clearly illegal. *See* American Bar Association Committee on Federal Regulation of Securities, *Report of the Task Force on Regulation of Insider Trading*, 41 Bus.Law. 223, 252 (1985) ("Rule 14e–3 squarely raises the issue whether the [SEC] has the authority to impose a limited equal-access rule in the aftermath of *Chiarella, Dirks* [*v. SEC*, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)], and *Schreiber*."); *id.* at 251 & n. 109 (collecting commentaries expressing doubt as to validity of rule).

The majority would confine *Chiarella's* authority to section 10(b) and rule 10b–5, deeming it entirely without precedential value as to section 14(e) and rule 14e–3(a). *Chiarella* drew heavily, however, upon common law concepts of fraud. Its key ruling is that "the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" 445 U.S. at 228, 100 S.Ct. at 1114. The internal quotation is from the Restatement (Second) of Torts § 551(2)(a) (1976), with an added notation that the American Law Institute regards the rule as applicable to "securities transactions." *See id.* at 228 n. 9, 100 S.Ct. at 1114 n. 9. No reason appears why this generally applicable rule of law, not derived in any way from the language or history of section 10(b) and rule 10b–5, should have definitive force in the construction and interpretation of those provisions,

but none where section 14(e) and rule 14e–3(a) are concerned.

Furthermore, both the Supreme Court and this court have explicitly recognized that section 14(e) is modeled upon the antifraud provisions of § 10(b) and Rule 10b–5. *See Schreiber*, 472 U.S. at 10 & n. 10, 105 S.Ct. at 2463 & n. 10; *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 961 (2d Cir.1987) (citing *Chris–Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 232, 38 L.Ed.2d 148 (1973)).

Against this background, the majority's efforts to distinguish *Chiarella* are less than convincing. It is true that section 14(e), unlike section 10(b), directly proscribes "fraudulent" acts and practices, but this is a barely discernible departure from section 10(b)'s prohibition of "deceptive device[s] or contrivance[s]," *see* Restatement (Second) of Torts at 55 (1977) (equating "fraudulent representation" and "deceit"), and both sections envision implementation by SEC regulations. In any event, this proscription hardly heralds an intention to change the meaning of the term "fraud" as previously understood in both the general law and securities law. Nor does the slight difference in language between the two provisions' delegation of rulemaking authority to the SEC plausibly signify that Congress vested the SEC with the power to make such a change. Further, while the language of rule 14e–3(a) concededly "reveals express SEC intent to proscribe conduct not covered by common law fraud," as the majority states, that revelation poses, rather than decides, the question that we must resolve.

The majority opinion notes a passage in *Chiarella* that alludes to (then) proposed rule 14e–3 as a bar to warehousing of target stock in a tender offer "on a 'somewhat different theory' than that previously used to regulate insider trading as fraudulent activity." *Chiarella*, 445 U.S. at 234, 100 S.Ct. at 1118 (quoting 1 SEC Institutional Investor Study Report, H.R.Doc. No. 64, 92nd Cong., 1st Sess., pt. 1 (the "Report"), at xxxii (1971)). The majority then identifies the "theory" as "one that does not embrace 'any fiduciary duty to the [target] company or its shareholders,'" quoting the Report at xxxii. In fact, the Report only states that people who plan takeovers do not "usually have any fiduciary duty to [the target] company or its shareholders." Further, the majority vests significance in the fact that "the *Chiarella* Court did not disapprove of this exercise of the SEC's rulemaking power under section 14(e)." Such a disapproval would have been wholly gratuitous in the circumstances. In sum, this passage cannot fairly be read as obviating the fact that *Chiarella* establishes a general rule linking securities fraud to a breach of fiduciary duty, and that rule 14e–3(a) represents an obvious effort by the SEC to circumvent that rule by exercising an authority that has not been entrusted to that body.

*Schreiber*, as I have noted, establishes that section 14(e) was modeled upon section 10(b) and rule 10b–5, *see* 472 U.S. at 10 n. 10, 105 S.Ct. at 2463 n. 10, thus reinforcing the precedential value of *Chiarella* for the present case; and discountenances any notion that the 1970 amendment to section 14(e) intended any change in the meaning of the fundamental term "manipulative," *see* 472 U.S. at 12 n. 11, 105 S.Ct. at 2464 n. 11, undercutting the notion that the term "fraudulent" was invested by the same amendment with the novel content for which the SEC contends. *Dirks v. SEC*, 463 U.S. 646, 653, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983), explicitly rejected, in the section 10(b)/rule 10b–5 context, the SEC's view "that anyone who knowingly receives nonpublic material information from an insider has a fiduciary duty to disclose before trading." Rule 14e–3(a) purports to avoid the impact of *Dirks* by simply discarding the concept of fiduciary duty in the tender offer context.

I am aware, of course, that we ordinarily defer to the interpretation of a statute provided by an agency charged with its enforcement. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *IBT v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n.

20, 58 L.Ed.2d 808 (1979). As the Court made clear in *Daniel,* however:

[T]his deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. On a number of occasions in recent years this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts. *See SEC v. Sloan,* 436 U.S. 103, 117–119, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 [n. 27], 51 L.Ed.2d 124 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–214, 96 S.Ct. 1375, 1390–1391, 47 L.Ed.2d 668 (1976); [*United Hous. Found., Inc. v.] Forman,* 421 U.S. [837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621 (1975)]; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 759 n. 4, 95 S.Ct. 1917, 1936 [n. 4], 44 L.Ed.2d 539 (1975) (POWELL, J., concurring); *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 425–427, 92 S.Ct. 596, 600–602, 30 L.Ed.2d 575 (1972).

439 U.S. at 566 n. 20, 99 S.Ct. at 800 n. 20; *see also Aaron,* 446 U.S. at 694 n. 11, 100 S.Ct. at 1954 n. 11 (rejecting SEC view that scienter not required in § 10(b) injunctive proceedings); *Business Roundtable v. SEC,* 905 F.2d 406, 407 (D.C.Cir.1990) (holding that SEC exceeded its statutory authority in promulgating rule 19c–4 to bar national securities exchanges and associations from listing stocks violative of one share/ one vote principle).

In promulgating rule 14e–3(a), the SEC has once again, in my view, acted in excess of its statutory authority. This is especially so because its action implicates serious criminal penalties. *See Touby,* 111 S.Ct. at 1756. Thus, to the extent that there is any ambiguity as to the authority vested in the SEC by the 1970 amendment of section 14(e), it should be resolved in Chestman's favor. As the Supreme Court said in *Crandon v. United States,* 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990), "because the governing standard is set forth in a criminal statute [here, 15 U.S.C. § 78ff(a) in tandem with rule 14e–3],

it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage.".

Accordingly, I would reverse all of Chestman's convictions, in accordance with the panel disposition. *See Chestman,* 903 F.2d at 84. I therefore dissent from the majority's affirmance of Chestman's convictions under section 14(e) and rule 14e–3, while joining in the balance of the majority opinion.